Jon M. Sands
Federal Public Defender
Kelly L. Culshaw (OH Bar No. 0066394: CA No. 304778)
Nicole List (HI Bar No. 10077)
Nathan A. Maxwell (AZ Bar No. 033838)
Assistant Federal Public Defenders
850 W. Adams St, Suite 201
Phoenix, Arizona 85007
kelly_culshaw@fd.org
nicole_list@fd.org
nathan_maxwell@fd.org
Telephone: (602)382-2816
Facsimile: (602) 889-3960

*Counsel for Petitioner*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Murray Hooper, <br><br> Plaintiff, <br><br> v. <br><br> MARK BRNOVICH, Attorney General of Arizona; JERI WILLIAMS, Police Chief for the City of Phoenix, <br><br> Defendants. | No. <br><br> **DEATH-PENALTY CASE** <br><br> **Expedited Ruling Requested** <br><br> **Complaint for Equitable Injunctive and Declaratory Relief [42 U.S.C. § 1983]** |

**I.    Nature of Action**

1.    This is an action for declaratory and injunctive relief under 42 U.S.C. § 1983. In 1982, Plaintiff Murray Hooper ("Plaintiff"), was sentenced to death in Maricopa County, Arizona. While a substantial amount of evidence is available for advanced forensic testing, DNA testing and other advanced forensic testing was previously

1

unavailable to Plaintiff because the trial took place in 1982.

2. Plaintiff has consistently maintained his innocence and has sought DNA and fingerprint testing of this evidence, but the State of Arizona has opposed this testing and the state courts have denied Plaintiff's motions.

3. Arizona law provides a right to postconviction advanced forensic testing—specifically, fingerprint testing—pursuant to Arizona Revised Statute § 13-4241 and DNA testing pursuant to Arizona Revised Statute § 13-4240. ("A.R.S. § 13-4241 or A.R.S. § 13-4240" or "the statutes"). Plaintiff properly filed a motion for testing pursuant to the statutes, and made the requisite showing, which should have entitled him to the requested DNA and fingerprint testing. *See* Mot. For Postconviction DNA and Advanced Forensic Testing, *State v. Hooper*, No. CR-0000-121686 (Maricopa Cnty. Super. Ct. Sept. 22, 2022) (Exhibit A); Minute Entry Denying Mot. For Postconviction DNA and Advanced Forensic Testing, *State v. Hooper*, No. CR-0000-121686 (Maricopa Cnty. Super. Ct. Oct. 24, 2022) (Exhibit B); Petition for Special Action, *Hooper v. Hon. Jennifer Green*, No. CV-22-0259-SA (Ariz. Oct. 31, 2022) (Ex. C). However, he was ultimately denied all forensic testing. *See Hooper v. Hon. Jennifer Green*, No. CV-22-0259-SA (Ariz. Nov. 10, 2022) (Exhibit D).

4. Accordingly, Plaintiff files this action to challenge the constitutionality of the statutes as applied by the State of Arizona. Given the unique ability of DNA and fingerprint evidence to identify the actual killers in this case, Defendants' continued refusal to allow Plaintiff to test key evidence in their possession denies him due process of law and access to the courts and violates his Eighth Amendment right to be free from cruel and unusual punishment. Plaintiff requests an order from this Court declaring that A.R.S. § 13-4241 and A.R.S. § 13-4240 as construed by the state courts in this case violate his constitutional rights. Plaintiff requests an order directing that the fingerprint evidence collected at the crime scene be run through local and national databases. Plaintiff further requests an order requiring

Defendants to release the DNA evidence to Plaintiff under a reasonable protocol regarding chain of custody and preservation of the evidence, so that Plaintiff can have the evidence tested at his own expense.

**II.     Parties**

5. PLAINTIFF, Murray Hooper, is currently incarcerated on death row following his 1982 murder convictions in the Superior Court of Maricopa County, Arizona. He is in the custody of the Arizona Department of Corrections, Rehabilitation & Reentry and has an execution date scheduled on November 16, 2022.

6. DEFENDANT, Mark Brnovich ("Attorney General"), is the Attorney General for the State of Arizona. The Arizona Attorney General's Office is located at 2005 North Central Avenue, Phoenix, AZ 85004. As such, he is responsible for enforcing and defending the laws of Arizona, including the statutes at issue in this case. The Attorney General is sued in his official capacity for the purpose of obtaining declaratory and injunctive relief.

7. DEFENDANT, Jeri Williams, is the Police Chief for the city of Phoenix located at 620 West Washington Street, Phoenix, AZ, 85003. The Phoenix Police Department has possession, control, and/or access to numerous items of physical evidence collected during the investigation of the crime of which Plaintiff was convicted that likely contain biological material suitable for DNA testing or viable fingerprints suitable for testing, but which were either not tested previously or could now be tested with new technology that was not available at the time of Plaintiff's trial. She is sued in her official capacity for the purpose of obtaining declaratory and injunctive relief.

**III.    Jurisdiction and Venue**

8. This Court has jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343 because this is an action to address the deprivation, under color of state law, of Plaintiff's rights under the First, Eighth, and Fourteenth Amendments.

9. Venue lies within the District of Arizona under 28 U.S.C. § 1391(b)(1) and (2) because the Defendants reside in this District and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

**IV  Factual Background**

    **A.  The Crime and Plaintiff's Conviction**

10. On December 31, 1980, William "Pat" Redmond and his mother-in-law, Helen Phelps, were shot and killed by three home invaders. *State v. Bracy*, 703 P.2d 464, 469 (Ariz. 1985). Redmond's wife, Marilyn, was shot in the head but survived. *Id*.

11. The State rapidly focused on Plaintiff, William Bracy, and Edward McCall, relying on inherently suspicious and unreliable sources: four well-paid informants who received everything from sentencing immunity to money, drugs, and sex. Then, after Mrs. Redmond initially said she could not identify the perpetrators, she was flown to Chicago nearly two months later to identify Plaintiff and Bracy in a police station lineup. (Tr. 12/20/1982 at 65–70; Tr. 11/30/1982 p.m. at 58–61.)

12. Mrs. Redmond initially indicated she could not identify the intruders since she was too afraid to look at them. (Tr. 11/30/1982 p.m. at 73; Tr. 8/26/1982 at 141–42.) She described the perpetrators as three black men, some wearing masks. (Tr. 11/8/1982 p.m. at 73; Tr. 11/3/1982 at 171, 180, 184, 221–22, 230–31, 237–38; Tr. 8/27/1982 at 69–70.) Later, she stated that two Black men and one white man committed the crime. (Tr. 11/3/1982 at 221, 231, 248.) After Mrs. Redmond identified two of the suspects as wearing masks—proving she could not identify them—she described the suspects as clean-shaven. (Tr. 11/8/1982 p.m. at 74–75.) Still, Mrs. Redmond was unable to describe the assailants' facial features. (Tr. 11/4/1982 at 50; Tr. 11/3/1982 at 221–22, 230.) And although Plaintiff had a distinct white patch in the front of his hair (Tr. 11/18/1982 at 51; Tr. 12/8/1982 a.m. at 94–95; Tr. 12/8/1982 p.m. 36–37), Mrs. Redmond never mentioned seeing this. Mrs. Redmond noted that one of the Black men wore a gold chain and another wore

a leather-like jacket. (Tr. 11/10/1982 at 86; Tr. 11/9/1982 at 239–40.) Inconsistent with her own initial account that two of the three assailants wore face-covering masks, Mrs. Redmond later somehow identified Plaintiff and William Bracy as two of the assailants. (Tr. 11/30/1982 p.m. at 58–63.)

13. Plaintiff and Bracy were indicted together on one count of conspiracy to commit first-degree murder, two counts of first-degree murder, one count of attempted first-degree murder, three counts of kidnaping, three counts of armed robbery, and one count of first-degree burglary. (ROA 1.)

14. At trial, the State theorized that a man named Robert Cruz wanted Pat Redmond killed because Redmond was blocking a lucrative deal involving Las Vegas casinos. (Tr. 11/2/1982 at 7–8.) The State claimed Cruz recruited Plaintiff, Bracy, and McCall to kill Pat Redmond.

15. The State's case relied heavily on informant Arnie Merrill, a Valium-dependent drug dealer, fence for stolen goods, and mastermind of burglaries. (Tr. 11/29/1982 a.m. at 11; Tr. 11/24/1982 at 110–11; Tr. 11/16/1982 at 154; Tr. 11/18/1982 at 21–22, 171.) Merrill agreed to testify only after being incentivized with a State-sponsored offer. In exchange for testimony, Merrill only had to plead guilty to one of his many burglaries and thefts, and was guaranteed immunity for all other crimes, including arson, armed robbery, burglaries, and ultimately the Redmond home invasion and murder. (Tr. 11/16/1982 at 152–55.) These forgiven crimes had the potential to leave Merrill in prison for life, or worse if his fingerprints or DNA had been found at the scene. Merrill testified that he knew about the plan to kill Pat Redmond, drove the killers to Redmond's house and business, and helped them procure weapons. (Tr. 11/17/1982 at 9–11, 15–16, 28–32, 44–51, 64–65, 72, 106.) Despite admitted extensive involvement in the events resulting in the homicides, the State absolved Merrill of any responsibility. (Tr. 11/16/1982 at 152–54.) At the very least, by his own admissions, he was guilty of felony murder. Merrill's mostly uncorroborated account was the only source for much of the

evidence the State relied on to convict Plaintiff.

16. Informant George Campagnoni testified he was with Plaintiff and Bracy at Merrill's house on New Year's Eve. He also offered this testimony in exchange for a deal. (Tr. 11/29/1982 a.m. at 19; Tr. 11/24/1982 at 53–55, 83–84, 117–18.) Campagnoni formed a burglary ring with Merrill, McCall, and others and committed a spree of burglaries in October 1980. (Tr. 11/24/1982 at 54–55, 110–11.) Together, Campagnoni's crimes had the potential to leave him with consecutive sentences, and possibly life in prison, or worse if his fingerprints or DNA had been found at the scene. Instead, the State allowed Campagnoni to plead to one count of burglary and one count of theft. (Tr. 12/20/1982 at 172, 176; Tr. 11/29/1982 a.m. at 19; Trial Exhibit 209.) Although Campagnoni possessed property stolen from the Redmonds—evidence of a more active participation then he let on (Tr. 11/24/1982 at 92–93; Tr. 11/16/1982 at 126–27)—he was given immunity (Tr. 11/29/1982 a.m. at 14–15).

17. Informant Nina Marie Louie was a prostitute and sold drugs. (Tr. 11/23/1982 at 88–90, 105–07, 138–39.) Louie said she saw Plaintiff and Bracy at her apartment in Phoenix on New Year's Eve. (Tr. 11/23/1982 at 30.) The State compensated Louie for her testimony. (Tr. 12/20/1982 at 7–8; Tr. 11/23/1982 at 64–68.)

18. Plaintiff has always maintained his innocence and continues to do so today. His defense was that he was not in Arizona when the crime was committed. Multiple people saw Plaintiff in Chicago. Alibi witnesses supported Plaintiff's defense through testimony at trial.

19. On December 24, 1982, the jury convicted Bracy and Plaintiff on all counts. Subsequently, the court found five aggravating factors, three of which have since been voided, and imposed the death penalty. (Tr. 2/11/1983 at 29–34.)

20. Plaintiff exhausted his state and federal court remedies as detailed at *Hooper v. Shinn*, 985 F.3d 594, 610–14 (9th Cir. 2021).

21. On September 22, 2022, Plaintiff petitioned the Maricopa County Superior

Court for DNA and other advanced forensic testing. (Exhibit A.)

22. The Arizona Supreme Court issued a warrant for Plaintiff's execution on October 12, 2022. Plaintiff's execution is scheduled for November 16, 2022.

23. The Maricopa County Superior Court denied Plaintiff's request for DNA and advanced forensic testing by minute entry issued October 21, 2022. (Exhibit B.)

24. Plaintiff then filed a special action challenging that decision on October 31, 2022. (Exhibit C.) The Arizona Supreme Court denied the special action on November 10, 2022. (Exhibit D.)

### B. DNA and Fingerprint Evidence Left by the Perpetrator Has Never Been Tested

25. Law enforcement recovered numerous pieces of physical evidence from the crime scene, including (i) the bloodied knife used to cut Mr. Redmond's throat; (ii) fingerprints lifted from the spool of tape used by the perpetrators to bind the victims' hands; (iii) fingerprints lifted from the hall closet door handle where the perpetrators searched; (iv) fingerprints lifted from the coffee table where one of the perpetrators sat; and (v) fingerprints lifted from various other places in the house.

26. Because DNA testing did not exist at the time of Plaintiff's trial in 1982, no items were tested for DNA.

27. Because fingerprint comparison was in its infancy at the time of Plaintiff's 1982 trial, the prints collected at the scene were only visually compared. It was not precise and was left to the discretion of the person comparing the prints. Latent prints were lifted at the scene and comparison prints were obtained under controlled conditions on a fingerprint card. (Tr. 11/15/1982 at 6–7.) The fingerprints were then enlarged and compared by eye. (Tr. 11/15/1982 at 6.)

28. Fingerprint technology has changed dramatically since Plaintiff's 1982 trial. One need only look at the changes in FBI fingerprint analysis. In July 1999, nearly two decades after Plaintiff's trial, the FBI published its online computerized Integrated Automated Fingerprint Identification System (IAFIS). *See* Privacy

Impact Assessment Integrated Automated Fingerprint Identification System National Security Enhancements, at https://www.fbi.gov/how-we-can-help-you/need-an-fbi-service-or-more-information/freedom-of-informationprivacy-act/department-of-justice-fbi-privacy-impact-assessments/firs-iafis (last visited Nov. 8, 2022). This national system allowed for "storing, comparing, and exchanging fingerprint data in a digital format [which] permits comparisons of fingerprints in a faster and more accurate manner." *Id*. More than a decade later (and nearly 30 years after Plaintiff's trial) the FBI developed the Next Generation Identification (NGI) system. https://le.fbi.gov/science-and-lab-resources/biometrics-and-fingerprints/biometrics/next-generation-identification-ngi (last visited on Nov. 7, 2022).

29. The NGI brought the FBI's identification services "to the next level[,]" improving on "the efficiency and accuracy of biometric services[.]" *Id*. The NGI includes the Advanced Fingerprint Identification Technology (AFIT), which replaced IAFIS in February 2011. The AFIT increases both accuracy and capacity of the IAFIS's fingerprinting capabilities as well as improving system availability. *Id*. A new algorithm for fingerprint-matching was introduced, improving accuracy from 92% to 99.6%. *Id*.

**C.     Plaintiff's Efforts to Obtain Post-Conviction DNA and Fingerprint Testing**

30. On September 29, 2021, the Arizona legislature enacted A.R.S. § 13-4241 to create post-conviction relief procedures for newly available forensic testing. 2021 Ariz. Legis. Serv. Ch. 157, § 1.

31. In 2000, the Arizona legislature enacted A.R.S. § 13-4240 to allow post-conviction DNA testing. 2000 Ariz. Legis. Serv. Ch. 373, § 1.

32. With the advent of DNA testing, more advanced fingerprint testing, and the passage of the statutes, Plaintiff attempted to establish his innocence through both fingerprint and DNA testing. As discussed above, in 2022, Plaintiff filed a petition

in the Superior Court of Maricopa County under A.R.S. § 13-4241 and A.R.S. § 13-4240 requesting both fingerprint and DNA testing of certain items of evidence, including the knife used in the commission of the crime and the tape spool from the tape used to bind the hands of the victims. (*See* Exhibit A.)

33. In his motion, Plaintiff identified several items of physical evidence secured during the investigation of the crime, the testing of which would demonstrate his innocence. These items fell into two main categories: (i) items known through eyewitness testimony to have been touched by one or more of the three attackers; and (ii) fingerprints collected in areas of the home where the three attackers were thought to have touched. For each item of evidence, Plaintiff explained both how the evidence was suitable for robust modern DNA and fingerprint testing and why each item was highly probative to the identity of the true perpetrator of the crime for which Plaintiff was sentenced to death. Specifically, Plaintiff described how the State relied heavily on paid informants, committed multiple acts of prosecutorial misconduct, and the only eyewitness gave several different descriptions of the attackers that ranged from not looking at them at all to them all wearing masks to none of them wearing masks.

34. Testing of this evidence could identify the true attackers and had this testing been available at the time of the trial, forensic evidence placing one of the State's paid informants or the identified alternative suspects in the Redmond home would have been exculpatory.

35. Plaintiff demonstrated in his motion that the testing he sought is scientifically sound and that the evidence on which he sought such testing was in the possession of the State of Arizona.

36. Plaintiff identified several ways that DNA and fingerprint test results could raise a reasonable probability that he was not the assailant and thus entitle him to both fingerprint and DNA testing under the statutes.

37. First, Plaintiff explained that if DNA or fingerprint test results on the knife,

1 tape spool, closet door, or coffee table matched a known alternative perpetrator, such as Arnie Merrill, George Campagnoni, Ronald Bradford, Michael Bradford, Novel Ward, or another viable CODIS or AFIT hit, the results would raise a reasonable probability that Plaintiff was not responsible for the murders of Mr. Redmond and Mrs. Phelps as is required under A.R.S. § 13-4241(B)(1)–(4).

38. Second, Plaintiff explained that if DNA and fingerprint test results on multiple items of evidence all pointed to an alternative perpetrator(s), the State's theory would fall apart, and this would raise a reasonable probability that Plaintiff would not have been prosecuted or convicted. *See* A.R.S. § 13-4241(B)(1)–(4).

39. Finally, Plaintiff explained that a DNA profile obtained from newly tested evidence could be run through the federal CODIS database. Similarly, the fingerprints that were already lifted from the scene could be run through local databases and the national AFIT database. If the evidence "hit," pointing to an individual in the CODIS or AFIT databases, such information would further support Plaintiff's claim of innocence.

40. The superior court denied Plaintiff's motion for testing. (*See* Exhibit B.) On appeal, the Arizona Supreme Court denied the request for a testing. (*See* Exhibit C.) However, he was ultimately denied. (*See* Exhibit D.)

41. Having satisfied the materiality requirements of A.R.S. § 13-4241 and A.R.S. § 13-4240, Plaintiff's motion for DNA and fingerprint testing should have been granted.

**V. Claims for Relief**

**COUNT I: DENIAL OF DUE PROCESS**

42. Plaintiff incorporates by reference paragraphs 1 through 41 of this Complaint as set forth fully herein.

43. Arizona Revised Statute § 13-4241 provides that a person who was sentenced for a felony offense, who meets the requirements of the statute, may request "[a]t any time" that evidence that is in the possession or control of the State, related to

the investigation or prosecution of the case, be either forensically tested with a technique that was not available at the time of trial and that is widely accepted in the scientific community via technological advances, A.R.S. § 13-4241(A)(1), or "[u]ploaded to searchable local, state or national databases that are subject to the standards imposed by the agency that is responsible for managing the database[,]"A.R.S. § 13-4241(A)(2).

44. The Court "shall" order the new testing after providing notice to the prosecutor and opportunity for a response, if the Court finds that all the following apply:

    1. A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through the new forensic testing.

    2. The evidence is still in existence and is in a condition that allows the new forensic testing to be conducted.

    3. The evidence was not previously subjected to . . . the analysis or comparison that is now requested.

    4. The new forensic testing may resolve an issue that was not previously resolved by any other testing. (13-4241(B)(1)–(4).)

45. Under A.R.S. § 13-4240(A), a person who was sentenced for a felony offense, and who meets the requirements of the statute, may request "[a]t any time" DNA testing of "any evidence that is in the possession or control of the court or the state, that is related to the investigation or prosecution [of the case], and that may contain biological evidence."

46. The Court "shall order [DNA] testing" after providing the prosecutor with notice and opportunity to respond to the defendant's request if the Court determines these provisions apply: a reasonable probability exists that the petitioner would not

have been prosecuted or convicted if DNA testing had produced exculpatory results; the evidence is still in existence, in a condition that allows DNA testing to be conducted; and the evidence was not subjected to the testing now requested, and that may resolve an issue not resolved by the previous testing. A.R.S. § 13-4240(B)(1)–(3).

47. When a state law creates a liberty interest, such as the statutes above, the state's procedures must comport with procedural due process. Likewise, when a state creates a judicial remedy, access to that remedy must be fairly afforded.

48. Plaintiff has a constitutionally protected liberty interest in access to post-conviction relief, and he was denied due process in seeking access to such post-conviction relief. *See Skinner v. Switzer*, 562 U.S. 521 (2011). Because the procedures for obtaining DNA and fingerprint testing can be essential to realizing the right to post-conviction relief, those procedures must not offend fundamental principles of justice or "transgress[] any recognize[d] principle of fundamental fairness in operation." *Medina v. California*, 505 U.S. 437, 448 (1992) (internal citations and quotation omitted).

49. Plaintiff has availed himself of the state court procedures available to him to seek access to the physical evidence in Defendants' possession or control so that he may conduct post-conviction DNA and fingerprint testing to prove his actual innocence of the murders.

50. Here, Plaintiff was denied access to DNA and fingerprint testing of evidence due to the unreasonably restrictive and unconstitutional interpretations of the statutes by Arizona courts, rendering A.R.S. § 13-4240 and A.R.S. § 13-4241 essentially unavailable, in violation of his procedural due process rights.

51. First, the Arizona courts construed the statutes to impose an unconstitutional barrier to Plaintiff's access to post-conviction remedies by way of DNA and fingerprint testing by reading into the statutes a near impossible requirement—that Plaintiff must prove his innocence as a precondition of obtaining DNA and

fingerprint testing, when DNA and fingerprint testing are the only means in some cases, like Plaintiff's, to exonerate the wrongly convicted.

52. Contrary to the state court's construction in the present case, the statutes do not require that petitioners establish that the DNA and fingerprint test results would "show actual innocence" or that petitioners exonerate themselves as an initial matter before they are permitted to receive testing. Under A.R.S. § 13-4240(B)(1), the Plaintiff must only show a "reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through deoxyribonucleic acid testing." Under A.R.S. § 13-4240(C)(1)(a), "the petitioner's verdict or sentence would have been more favorable if the results of deoxyribonucleic acid testing had been available at the trial leading to the judgment of conviction." And lastly, under A.R.S. § 13-4241(B)(1)-(4), Plaintiff must show "[a] reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through the new forensic testing."

53. In the instant case, Plaintiff identified a theory of innocence: that he did not kill Mr. Redmond or Mrs. Phelps, that he was not present in Phoenix, that he was mistakenly identified, and that he was framed by invested informants. Here, DNA and fingerprint testing have the potential to develop the profile of the actual perpetrator who has no explanation for the presence of their DNA or fingerprints comingled with evidence recovered from the crime scene. The presence of such a suspect's DNA or fingerprints would strongly support Plaintiff's theory of innocence and show a "reasonable probability" that he did not commit this murder.

54. Assuming as it must under the status the Arizona court acknowledged here that the results of the forensic testing would be inconsistent with the state theory. Despite that, the courts denied the testing, finding that even if the testing results pointed to the informants, it would not undermine the overwhelming evidence of Plaintiff's guilt. But that overwhelming evidence itself was the testimony of these

13

paid informants. To simply, the overwhelming evidence upon which they relied to deny the testing is exactly the evidence which the testing would undermine.

55. The purpose of A.R.S. § 13-4240 and A.R.S. § 13-4241 is thwarted by precluding access to DNA and fingerprint testing and blocking constitutionally required access to other related post-conviction relief. Many convicted persons, like Plaintiff, who have articulated a theory of innocence and demonstrated a reasonable probability that DNA and fingerprint testing could prove their innocence—all the statutes require—cannot do more to cast doubt on the evidence used to convict them, or prove their innocence, without such testing. Such prisoners, therefore, cannot meet the nearly impossible burden imposed on them by the Arizona courts. This burden is fundamentally unfair and violates Plaintiff's right to due process of law.

56. The superior court found the trial evidence so "overwhelming" that new forensic evidence would make no difference. (Exhibit B at 5–6.) The evidence was not overwhelming to the jury. It deliberated over the course of three days before reaching a verdict. The standard applied by the superior court was severely flawed. Even if the evidence at Plaintiff's trial was overwhelming, that is not the test. The point of these proceedings is that if the jury had exculpatory results of forensic testing, the evidence would no longer have been "overwhelming"; the case either would never have been charged or if charged, there is a reasonable probability Plaintiff would not have been convicted.

57. Furthermore, by construing the statutes to contain such a requirement, Defendants and the Arizona courts also deprived Plaintiff of his protected liberty interest in obtaining post-conviction remedies, which is to be afforded under Arizona law to those who can present such exculpatory evidence. Because these statutes provide a state-centered right to fingerprint and DNA testing, that right "beget[s] yet other rights to procedures essential to the realization of the parent right." *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 463 (1981). Plaintiff can

only unlock certain post-conviction remedies under these statutes, such as vacation of the sentence, resentencing, or a new trial, if they are first granted access to fingerprint and DNA testing.

58. Moreover, Defendants and Arizona courts' interpretation of these statutes "offends [a] principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Medina v. California*, 505 U.S. 437, 445 (1992) (citations and quotation marks omitted). The execution of an innocent person in a case where fingerprint evidence and DNA evidence suitable for testing was available, but unused, is a fundamental miscarriage of justice that offends our most basic notions of fairness and decency. Thus, Plaintiff's right to procedural due process—to a fair and meaningful opportunity to demonstrate his innocence through DNA and fingerprint testing—has been violated for this reason as well.

59. Accordingly, the unreasonable interpretation of these statutes, as authoritatively construed by Defendants and Arizona courts, deprives Plaintiff of his procedural due process right to vindicate a state-created liberty interest in post-conviction relief, in violation of the Due Process Clause of the Fourteenth Amendment, and offends fundamental principles of justice, and deprives Plaintiff of his due process rights.

### COUNT II: DENIAL OF RIGHT TO MEANINGFUL ACCESS TO COURTS

60. Plaintiff incorporates by reference paragraphs 1 through 59 of this Complaint as set forth fully herein.

61. Arizona has provided a post-conviction process for convicted persons to seek access to fingerprint and DNA testing of physical evidence collected in their case to demonstrate their innocence through these statutes.

62. Here, if Plaintiff could access and test the physical evidence in Defendants' possession or control, he could raise a post-conviction claim under these statutes, seeking remedies such as a new trial, resentencing, or vacatur of his sentence, if the

15

1. results of testing are exculpatory.

63. These statutes, as authoritatively construed by Arizona courts, imposes an unreasonable barrier to court access not contemplated by the legislature by reading into these statutes an impossible hurdle to obtaining fingerprint and DNA testing results. It therefore arbitrarily and unconstitutionally deprives Plaintiff of meaningful access to post-conviction procedures provided by Arizona law to establish that he is innocent of the crime for which he was convicted and sentenced, in violation of the Petition Clause of the First Amendment to the United States Constitution.

## COUNT III: CRUEL AND UNUSUAL PUNISHMENT

64. Plaintiff incorporates by reference paragraphs 1 through 63 of this Complaint as set forth fully herein.

65. Plaintiff challenges Arizona's post-conviction fingerprint and DNA statutes as construed by Defendants and the Arizona courts to foreclose access to fingerprint and DNA testing as a violation of his right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution.

66. When a defendant's life is at stake, a court must be "particularly sensitive to insure that every safeguard is observed." *Gregg v. Georgia*, 428 U.S. 153, 187 (1976). The penalty of death is qualitatively and profoundly different from any other sentence. *E.g.*, *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) ("In capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability. This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different." (internal citations omitted)). Thus, our system of justice must go "to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." *Eddings v. Oklahoma*, 455 U.S. 104, 118 (1982) (O'Connor,

J. concurring). Arizona's construction of these statutes to deny Plaintiff basic procedural rights to access fingerprint and DNA testing to demonstrate his innocence before he is executed violates the Eighth Amendment for these reasons as well.

**COUNT IV: DENIAL OF OPPORTUNITY TO PROVE ACTUAL INNOCENCE**

67. Plaintiff incorporates by reference paragraphs 1 through 66 of this Complaint as set forth fully herein.

68. By refusing to release the physical evidence for fingerprint and DNA analysis, and thereby preventing Plaintiff from gaining access to evidence that could exonerate him, Defendants have denied Plaintiff the opportunity to make a conclusive showing that he is actually innocent of the crime for which he is currently incarcerated and sentenced to die, in violation of the Due Process Clause of the Fourteenth Amendment.

69. The State of Arizona will suffer no prejudice by allowing Plaintiff to access the evidence for purposes of fingerprint and DNA testing. Any cost related to the fingerprint and DNA testing would be paid for by Plaintiff's counsel.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Murray Hooper requests relief as follows:

A. A declaratory judgment that A.R.S. § 13-4240 and A.R.S. § 13-4241, as applied violate Plaintiff's rights under the First, Eighth, and Fourteenth Amendments;

B. A preliminary and permanent injunction requiring Defendants to take all reasonably necessary steps to preserve, produce, and release all physical evidence for fingerprint and DNA testing by a fully accredited DNA laboratory and fingerprint testing facility, pursuant to a mutually agreed upon protocol regarding chain of custody, preservation, and return of such evidence after testing has been

completed;

C. Declaratory and injunctive relief that Plaintiff is entitled to access to evidence for fingerprint and DNA testing, which is binding upon those persons in active concert or participation with them, under Federal Rules of Civil Procedure 65(d);

D. Ordering such other and further relief as the Court deems just and proper.

Respectfully submitted this 10th day of November, 2022.

                                      Jon M. Sands
                                      Federal Public Defender
                                      District of Arizona

                                      Kelly L. Culshaw
                                      Nicole List
                                      Nathan A. Maxwell

                                      <u>s/Kelly L. Culshaw</u>
                                      Counsel for Petitioner