Exhibit A    Motion for Postconviction DNA and Advanced Forensic Testing, *State v. Hooper*, No. CR-0000-121686 (Maricopa Cnty. Super. Ct. Sept. 22, 2022)

Exhibit B    Minute Entry Order Denying Motion for Postconviction DNA and Advanced Forensic Testing, *State v. Hooper*, No. CR-0000-121686 (Maricopa Cnty. Super. Ct. Oct. 24, 2022)

Exhibit C    Petition for Special Action, *Hooper v. Hon. Jennifer Green*, No. CV-22-0259-SA (Ariz. Oct. 31, 2022)

Exhibit D    Order Accepting Special Action Jurisdiction and Affirming Superior Court Order Denying Motion for Post-Conviction DNA and Advanced Forensic Testing, *Hooper v. Hon. Jennifer Green*, No. CV-22-0259-SA (Ariz. Nov. 10, 2022)

# EXHIBIT A

Jon M. Sands
Federal Public Defender
Cary Sandman (AZ No. 004779)
Nathan Maxwell (AZ No. 033838)
Assistant Federal Public Defenders
850 W. Adams St., Suite 201
Phoenix, Arizona 85007
cary_sandman@fd.org
nathan_maxwell@fd.org
Telephone: (602)382-2816
Facsimile: (602) 889-3960

*Counsel for Defendant*

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| STATE OF ARIZONA,<br><br>        Plaintiff,<br><br>v.<br><br>MURRAY HOOPER,<br><br>        Defendant. | CR-0000-121686<br><br>**MOTION FOR POSTCONVICTION DNA AND ADVANCED FORENSIC TESTING**<br><br>**(Capital Case)**<br><br>**(Oral Argument Requested)**<br><br>(Hon. Jennifer Green) |

Murray Hooper, through undersigned counsel, respectfully asks this Court to order postconviction advanced forensic testing—specifically, fingerprint testing—pursuant to A.R.S. § 13-4241 and postconviction DNA testing pursuant to A.R.S. § 13-4240. Hooper was convicted of murder in 1982, before computerized fingerprinting systems, including the FBI labs system, were available. Similarly, Hooper's trial occurred before the availability of DNA testing in criminal cases. Hooper has steadfastly asserted his innocence of this crime, insisting he was misidentified and framed. Previously collected fingerprints may be linked to the actual perpetrators through advanced technology now available. Moreover, items collected from the

1

scene of the crime that have never been tested potentially contain DNA, which together with the fingerprint evidence, may lead to the potential identification of the guilty parties. Testing such items will settle once and for all that Hooper was neither a participant nor present when this crime occurred. This motion is supported by the accompanying memorandum of points and authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. Introduction

Murray Hooper is on death row[1] for a crime he maintains he did not commit. His conviction resulted from a series of contemptible and corrupt practices engaged in by police, lawyers, and witnesses in both Chicago and Phoenix. Hooper was convicted with no physical or forensic evidence tying him to the scene of the crime, and despite his alibi that he was home in Chicago when this crime occurred. Hooper was named as a participant in this crime as a result of an unreliable eyewitness identification and by informants and co-conspirators who received extraordinary consideration and benefits from the State in exchange for their testimonies, including immunity, money, drugs, and unsupervised trips away from jail for conjugal visits.

Hooper was eventually mistakenly identified by Marilyn Redmond, who survived being shot in the head during the commission of the murders. After initially proclaiming that she could not identify any of her assailants (Tr. 11/30/1982 p.m. at 73; Tr. 8/26/1982 at 141–42), just two months later, Mrs. Redmond was flown to Chicago to view a lineup conducted by Chicago detectives in a department known to physically and mentally torture people into making false confessions and false accusations against other suspects.[2] Investigations have also

---

[1] The State has asked the Arizona Supreme Court to issue a warrant of execution for Mr. Hooper. Motion for Warrant of Execution, *State v. Hooper*, No. CR-83-0044-AP (Ariz. Aug. 26, 2022). The Arizona Supreme Court anticipates conferencing the matter on October 12, 2022. Order, *State v. Hooper*, No. CR-83-0044-AP (Ariz. Aug. 24, 2022).

[2] This corruption, torture, and coercion campaign is extensively documented and no longer disputable, having resulted in dozens of exonerations and hundreds of millions of dollars in civil lawsuit payouts to the victims. The Invisible Institute, a nonprofit journalism production company in Chicago, has made information detailing the corrupt and abusive practices publicly

2

revealed that detectives obtained wrongful identifications of accused persons through coercion and inappropriate, suggestive interrogation techniques. Beyond these examples of intentional corruption and interference, the lineup procedures used by Chicago police at the time have been repeatedly updated and reformed to address practices which may subtly cue the witness to identify a certain person or otherwise render an unreliable identification. *See The Science Behind Eyewitness Identification Reform, Innocence Project*, available at: https://innocenceproject.org/science-behind-eyewitness-identification-reform/ ("Numerous studies show that lineup administrators, when they know who the suspect is, can strongly bias the eyewitnesses. Usually unintentional, an administrator may make a suggestive statement or supply an unconscious gesture or facial expression that provides misleading feedback to the witness.").

Mrs. Redmond's identification of Hooper was inherently unreliable, and her account of the evening changed substantially over time. She changed her description of the race of the assailants; whether she even looked at them, or whether they were wearing masks. (*See, e.g.*, Tr. 11/3/1982 at 222; Tr. 11/8/1982 at 190; Tr. 11/10/1982 at 71.) When the corrupt methods through which Chicago detectives routinely secured tainted suspect identifications are added to the mix, Mrs. Redmond's identification immediately becomes indisputably dubious.

The unreliability of the testimony implicating Hooper calls his conviction into question because there is no physical or forensic proof he was at the scene of the crime, or even in the State of Arizona at the time. Yet items from the crime scene still exist and forensic testing for fingerprints and DNA now, presents a unique and compelling opportunity to finally discover the actual perpetrators of the crime, while showing that Hooper was not present, as his alibi witnesses testified at trial.

---

available via DropBox. *See, e.g.*, *Summary of Judicial, Executive, and Administrative Findings and Admissions Concerning Systemic Chicago Police Torture at Area 2 and 3*, The Invisible Institute, available at: https://www.dropbox.com/sh/ch5e6i674shwpr8/AAANdI2LMWFVsKJ-xB0pdtZDa/02.%20Torture.Findings.Admissions.Decisions.Docs.Opinions.Pleadings?dl=0&preview=8.10.06.Summary+of+Judical%2C+Administrative+and+prosecutorial+Findings+and+Admissions.wpd&subfolder_nav_tracking=1 (last visited Sept. 9, 2022).

3

As many as twelve fingerprints were found at the crime scene. Only one fingerprint was identified; a print that belonged to a victim. A bloodied kitchen knife (Trial Exhibit 7) used during the crime was also found at the crime scene, in the Redmond's bedroom. New, highly sensitive, DNA testing methods now exist that were not available at the time of the original trial—indeed, DNA testing did not exist in any form during Hooper's trial. As explained below, if exculpatory evidence resulting from fingerprint and DNA testing had been available prior to Hooper's trial, there is a reasonable probability that he would not have been prosecuted, or if tried, not convicted of capital murder.

Therefore, Hooper requests, pursuant to A.R.S. §§ 13-4241 and 13-4240, that the Court order advanced forensic testing of fingerprint evidence, by uploading such evidence to all available local, state, and national searchable databases, and further order DNA testing of the evidence using current and best methods, in accordance with all forensic testing requirements necessary to obtain valid results. *See* A.R.S. § 13-4241; A.R.S. § 13-4240(B), (C). The outcome of this testing will demonstrate Hooper's convictions must be overturned.

## II. Factual Background

On December 31, 1980, William "Pat" Redmond and his mother-in-law, Helen Phelps, were shot and killed by three home invaders. *State v. Bracy*, 145 Ariz. 520, 525 (1985). Redmond's wife, Marilyn, was shot in the head but survived. *Id.*

Mrs. Redmond initially indicated she could not identify the intruders, since she was too afraid to look at them. (Tr. 11/30/1982 p.m. at 73; Tr. 8/26/1982 at 141–42.) She described the perpetrators as three black men, some wearing masks. (Tr. 11/8/1982 p.m. at 73; Tr. 11/3/1982 at 171, 180, 184, 221–22, 230–31, 237–38; Tr. 8/27/1982 at 69–70.) Later, she stated that two black men and one white man committed the crime. (Tr. 11/3/1982 at 221, 231, 248.) After Mrs. Redmond identified two of the suspects as wearing masks—proving she could not identify them—she turned the tables and described the suspects as clean-shaven. (Tr. 11/8/1982 p.m. at 74–75.) Still, Mrs. Redmond was unable to describe the assailants' facial features. (Tr. 11/4/1982 at 50; Tr. 11/3/1982 at 221–22, 230.) And although Hooper had a distinct white patch in the front of his hair (Tr. 11/18/1982 at 51; Tr. 12/8/1982 a.m. at 94–95; Tr. 12/8/1982 p.m.

at 36–37), Mrs. Redmond never mentioned seeing this. Mrs. Redmond noted that one of the black men wore a gold chain and another wore a leather-like jacket. (Tr. 11/10/1982 at 86; Tr. 11/9/1982 at 239–40.)  Conflicting with her own initial account that two of the three offenders were wearing face covering masks, Mrs. Redmond somehow identified Hooper and Bracy as two of the assailants.[3] (Tr. 11/30/1982 p.m. at 58–63.)

The State rapidly focused on Murray Hooper, William Bracy, and Edward McCall relying on inherently suspicious and unreliable sources: four well-paid informants who received everything from sentencing immunity to money, drugs, and sex. Then nearly two months later, after she initially said she could not identify the perpetrators, Mrs. Redmond was flown to Chicago to identify Hooper and Bracy in a police station lineup. (Tr. 12/20/1982 at 65–70; Tr. 11/30/1982 p.m. at 58–61.)

Hooper and Bracy were indicted together on one count of conspiracy to commit first-degree murder; two counts of first-degree murder; one count of attempted first-degree murder; three counts of kidnaping; three counts of armed robbery; and one count of first-degree burglary. (ROA 1.)

At trial, the State theorized that Robert Cruz wanted Pat Redmond killed because Redmond was blocking a lucrative deal involving Las Vegas casinos. (Tr. 11/2/1982 at 7–8.) The State claimed Cruz recruited Hooper, Bracy, and McCall to kill Pat Redmond.

The State's case relied heavily on informant Arnie Merrill, a Valium-dependent drug dealer, fence for stolen goods, and mastermind of burglaries. (Tr. 11/29/1982 a.m. at 11; Tr. 11/24/1982 at 110–11; Tr. 11/16/1982 at 154; Tr. 11/18/1982 at 21–22, 171.) Merrill agreed to testify only after being incentivized with a State-sponsored offer he could not refuse. In exchange for testimony, Merrill only had to plead to one of his many burglaries and thefts, and was guaranteed immunity for all other crimes, including arson, armed robbery, burglaries, and

_____

[3] The prosecution also committed repeated misconduct, including delaying disclosure of evidence and wholesale failing to disclose evidence to the defense. For example, the Arizona Supreme Court found that the State failed to disclose benefits provided to Merrill and his wife. *See, e.g.*, *Bracy*, 145 Ariz. at 528.

ultimately the Redmond home invasion and murder. (Tr. 11/16/1982 at 152–55.) These forgiven crimes had the potential to leave Merrill in prison for life. Merrill testified that he knew about the plan to kill Pat Redmond, drove the killers to Redmond's house and business, and helped them procure weapons. (Tr. 11/17/1982 at 9–11, 15–16, 28–32, 44–51, 64–65, 72, 106.) Despite admitted extensive involvement in the events resulting in the homicides, the State absolved Merrill of any responsibility for the deaths. (Tr. 11/16/1982 at 152–54.) At the very least he was guilty of felony murder. Merrill's mostly uncorroborated account was the only source for much of the evidence the State relied on to convict Hooper.

Similarly, informant George Campagnoni testified he was with Hooper and Bracy at Merrill's house on New Year's Eve, but he offered this testimony in exchange for another incredible deal. (Tr. 11/29/1982 a.m. at 19; Tr. 11/24/1982 at 53–55, 83–84, 117–18.) Campagnoni formed a burglary ring with Merrill, McCall, and others and committed a spree of burglaries in October 1980. (Tr. 11/24/1982 at 54–55, 110–11.) Together, Campagnoni's crimes had the potential to leave him with consecutive sentences, and possibly life in prison. Instead, the State had Campagnoni plead to one burglary and one theft. (Tr. 12/20/1982 at 172, 176, Tr. 11/29/1982 a.m. at 19; Trial Exhibit 209.) Although Campagnoni possessed property stolen from the Redmonds—evidence of a more active participation then he let on (Tr. 11/24/1982 at 92–93; Tr. 11/16/1982 at 126–27)—he was given immunity (Tr. 11/29/1982 a.m. at 14–15).

Informant Nina Marie Louie was a prostitute and sold drugs. (Tr. 11/23/1982 at 88–90, 105–07, 138–39.) Louie said she saw Hooper and Bracy at her apartment in Phoenix on New Year's Eve. (Tr. 11/23/1982 at 30.) The State compensated Louie for her testimony. (Tr. 12/20/1982 at 7–8; Tr. 11/23/1982 at 64–68.)

Hooper has always maintained his innocence and continues to do so today. His defense was that he was not in Arizona when the crime was committed. Multiple people saw Hooper in Chicago. Alibi witnesses supported Hooper's defense through testimony at trial. On December 24, 1982, the jury convicted Bracy and Hooper on all counts. Subsequently, the court found

five aggravating factors, three of which have since been voided,[4] and imposed the death penalty. (Tr. 2/11/1983 at 25–26, 33–34.)

## III.   Argument

### A.   The Court should order testing of Fingerprint evidence under A.R.S. § 13-4241

Arizona Revised Statute § 13-4241 provides that a person who was sentenced for a felony offense, and who meets the requirements of the statute, may request "[a]t any time" that evidence that is in the possession or control of the state; related to the investigation or prosecution of the case, be either forensically tested with a technique that was not available at the time of sentencing and that is widely accepted in the scientific community via technological advances, A.R.S. § 13-4241(A)(1), or "uploaded to searchable local, state or national databases that are subject to the standards imposed by the agency that is responsible for managing the database[,]"A.R.S. § 13-4241(A)(2).

The Court "shall" order the new testing after providing notice to the prosecutor and opportunity for a response, if the Court finds that all of the following apply:

  1.   A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through the new forensic testing.

  2.   The evidence is still in existence and is in a condition that allows the new forensic testing to be conducted.

  3.   The evidence was not previously subjected to . . . the analysis or comparison that is now requested.

  4.   The new forensic testing may resolve an issue that was not previously resolved by any other testing.

*See* A.R.S. § 13-4241(B)(1)–(4). Here, Hooper's undersigned counsel have determined that the fingerprint evidence still exists and is within the State's custody for further forensic analysis. Therefore, for the reasons explained below, Hooper asks that fingerprints collected from

---

[4]On direct appeal, the Arizona Supreme Court vacated the (F)(3) aggravating factor. *State v. Hooper*, 145 Ariz. 538, 550 (1985). Then, in 2013, the (F)(1) and (F)(2) aggravating factors were vacated as a result of the issuance of a writ of habeas corpus following the Seventh Circuit's decision in *Hooper v. Ryan*, 729 F.3d 782 (7th Cir. 2013) and the State of Illinois' decision not to retry Hooper.

various items and surfaces at the crime scene be "uploaded to [the] searchable local, state or national databases that are subject to the standards imposed by the agency that is responsible for managing the database." *See* A.R.S. § 13-4241(A)(2).

Joe Depersis testified at Hooper's trial that between six and twelve fingerprints were lifted from the crime scene. (Tr. 11/15/1982 at 10–13, 32.) Depersis testified that he tried to ascertain which surfaces in the home could have been touched by the persons who committed the crime. (Tr. 11/15/1982 at 9.) Of the prints, only one print was "matched" to any person, and it was matched to Pat Redmond. (Tr. 11/15/1982 at 12.) None were linked to Hooper, Bracy, McCall, Merrill, or the alternative suspects who had been arrested by police that day after the crime. (Tr. 11/15/1982 at 11–16.)

At the time of Hooper's trial, fingerprints were visually compared. It was not an exact science. (Tr. 11/15/1982 at 6.) Latent prints were lifted at the scene and comparison prints were obtained under controlled conditions on a fingerprint card. (Tr. 11/15/1982 at 6–7.) The fingerprints were then enlarged and compared by eye. (Tr. 11/15/1982 at 6.)

Fingerprint technology has changed dramatically since Hooper's 1982 trial. One need only look at the changes in FBI fingerprint analysis. In July 1999, nearly two decades after Hooper's trial, the FBI's computerized Integrated Automated Fingerprint Identification System (IAFIS) came online. Privacy Impact Assessment Integrated Automated Fingerprint Identification System National Security Enhancements, at https://www.fbi.gov/services/information-management/foipa/privacy-impact-assessments/iafis (last visited Sept. 13, 2022). This national system allowed for "storing, comparing, and exchanging fingerprint data in a digital format [which] permits comparisons of fingerprints in a faster and more accurate manner." *Id.* More than a decade later (and nearly 30 years after Hooper's trial) the FBI developed the Next Generation Identification (NGI) system. https://le.fbi.gov/science-and-lab-resources/biometrics-and-fingerprints/biometrics/next-generation-identification-ngi (last visited on Sept. 13, 2022). The NGI brought the FBI's identification services "to the next level[,]" improving on "the efficiency and accuracy of biometric services[.]" *Id.* The NGI includes the Advanced Fingerprint Identification

Technology (AFIT), which replaced IAFIS in February 2011. The AFIT increases both accuracy and capacity of the IAFIS's fingerprinting capabilities as well as improving system availability. *Id.* A new algorithm for fingerprint-matching was introduced, improving accuracy from 92% to 99.6%. *Id.*

Hooper has detailed elsewhere, *see* Section II, the absence of any physical evidence, the unreliability and suspect nature of the testimony of the State's witnesses, and the evidence of corruption that tainted the police investigation and resulting proceedings. Against this, defense witnesses supported Hooper's alibi. In a case where Hooper's life is at stake, the need to further test forensic evidence that could exculpate him is compelling. Had forensic evidence excluded Hooper as the source of any fingerprint at the scene, or more importantly, linked an alternative suspect to the crime, a reasonable probability exists that Hooper would not have been prosecuted or convicted. Such exculpatory results may now be obtained from this new and highly advanced forensic testing.

Hooper asks that that the fingerprints, be "uploaded to [the] searchable local, state or national databases that are subject to the standards imposed by the agency that is responsible for managing the database," in accordance with forensic and scientific reliability metrics. *See* A.R.S. § 13-4241(A)(2). Hooper also requests the investigative testing results be entered into new national databases pursuant to the above provisions because he meets the requirements of A.R.S. § 13-4241(B)(1)–(4). Those provisions are akin to the provisions of A.R.S. § 13-4240(B)(1)–(3); accordingly, Hooper relies on and incorporates herein by reference the analysis provided in Section II, *supra.*

## B. The Court should order DNA testing under A.R.S. § 13-4240

Under A.R.S. § 13-4240(A), a person who was sentenced for a felony offense, and who meets the requirements of the statute, may request "[a]t any time" DNA testing of "any evidence that is in the possession or control of the court or state, that is related to the investigation or prosecution [of the case]; and that may contain biological evidence." This evidence was identified by the police as a bloodied kitchen knife, which was collected at the Redmond home. (Ex. A, Item 10.) The testing requested would determine first whether any biological material

remains on the item. If so, the testing could further show who used the kitchen knife to murder Mr. Redmond. Hooper has been steadfast, maintaining his innocence. DNA evidence on the knife, identifying individuals other than Hooper, would completely undermine the State's theory of the case, sustain Hooper's alibi, and satisfy the required statutory showing of a reasonable probability that Hooper would not have been prosecuted or convicted. *See* A.R.S. §§ 13-4240 & 13-4241.

### 1. Hooper is entitled to testing under the "mandatory testing" provisions of A.R.S. § 13-4240(B)

The Court "shall order [DNA] testing" after providing the prosecutor with notice and opportunity to respond to the defendant's request if the Court determines these provisions apply: a reasonable probability exists that the petitioner would not have been prosecuted or convicted if DNA testing had produced exculpatory results; the evidence is still in existence, in a condition that allows DNA testing to be conducted; and the evidence was not subjected to the testing now requested, and that may resolve an issue not resolved by the previous testing. A.R.S. § 13-4240(B)(1)–(3).

No physical evidence linked Hooper to the offenses. He was convicted based on highly suspect state-funded witness testimony and witness testimony tainted by corrupt and/or incompetent law enforcement practices, by agents located within and outside of Arizona. DNA testing did not exist at the time of Hooper's trial. However, new DNA testing that comports with the most current forensic and scientific requirements has the potential (along with renewed fingerprint analysis) to identify the actual perpetrators and undermine the integrity of Hooper's convictions. This is especially true, since DNA testing results should be eligible for entry into CODIS, enabling identification of the actual perpetrator. Had the testing been available and exculpatory results obtained, that evidence along with Hooper's alibi witnesses would have engendered a reasonable probability that (1) the State would have declined to prosecute Hooper, or, (2) if the State prosecuted him, he would not have been convicted. Hooper therefore satisfies the requirements for mandatory DNA testing under A.R.S. § 13-4240(B). Because the evidence still exists, testing can proceed immediately, in compliance with the requisite scientific and

administrative protocols as required by A.R.S. § 13-4240(B)(3).

**2.    Hooper is entitled to testing under the discretionary provisions of A.R.S. § 13-4240(C)**

The Court "may" order DNA testing after providing the prosecutor with notice and opportunity to respond to the defendant's request if the Court determines these provisions apply: there is a reasonable probability that the verdict or sentence would have been more favorable if the results of DNA testing had been available at trial, or, DNA testing will produce exculpatory evidence; the evidence is still in existence, in a condition that allows DNA testing to be conducted; and, the evidence was not subjected to the testing now requested, and that may resolve an issue not resolved by the previous testing. A.R.S. § 13-4240(C)(1)–(3).

Hooper also meets the requirements under A.R.S. § 13-4240(C)(1): had the State been able to conduct DNA testing during trial, there is a reasonable probability that the verdict or sentence would have been more favorable had exculpatory evidence been obtained. A.R.S. § 13-4240(C)(1)(a). Here, there is a reasonable probability that new DNA testing will yield exculpatory results. A.R.S. § 13-4240(C)(1)(b). If proper testing of the kitchen knife provides exculpatory evidence, that evidence, combined with the lack of any other reliable evidence linking Hooper to the crime, plus his alibi witnesses, will show a reasonable probability that the verdict or sentence would have been more favorable. What's more, scientifically reliable testing, leading to robust exculpatory results, "may resolve" issues not solvable by any other means, including the possibility of excluding Hooper as a participant in this crime. A.R.S. § 13-4240(C)(2)–(3).

Finally, as explained *supra* in the section detailing Hooper's entitlement to a mandatory order for DNA testing, because the evidence still exists and is in law enforcement custody, it can and should be tested in accordance with the most current, sensitive, and discriminating tests (*e.g.*, Powerplex Fusion). *See* Kathryn Oostdik et al., *Developmental validation of the PowerPlex Fusion System for analysis of casework and reference samples: A 24-locus multiplex for new database standards*, 12 Forensic Sci. Int'l: Genetics 69 (2014), https://reader.elsevier.com/reader/sd/pii/S1872497314000891?token=011E25BD0B9A9858B

1 490092741FA903CD4F11F3F1077B948E8C411431752608ADEE13C92F1906ABD71AF7
2 C8454BB1CAD&originRegion=us-east-1&originCreation=20210701014111.

### IV.    Conclusion

Murray Hooper is on death row as a result of a severely corrupt system which sought expedience over accuracy or truth. The only evidence linking Hooper to this crime is deeply unreliable. First, the State relied on statements from richly rewarded witnesses who received immunity for serious crimes and had every reason to lie. Second, an eyewitness, who gave conflicting descriptions of the assailants and who initially said that she could not identify anyone, was taken to Chicago to view an unrecorded lineup administered by a corrupt police agency. But these flaws need not go unredressed, nor should Hooper be put to death without exhausting this final opportunity to prove his innocence.

In light of the foregoing and the heightened reliability that the Eighth Amendment and corresponding provisions of the Arizona Constitution demand in cases where life and death hang in the balance, *see Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (explaining that "[b]ecause of th[e] qualitative difference" between death and other punishments, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case[]"), Hooper respectfully asks this Court to enter an order directing that the fingerprints collected at the crime scene be uploaded to local, state, and national searchable databases pursuant to A.R.S. § 13-4241. Hooper also requests that the kitchen knife found at the Redmond home be subjected to DNA testing using now-available forensic methods and in accordance with all necessary scientific and forensic reliability requirements pursuant to A.R.S. § 13-4240. Hooper also requests this Court enter an order directing that the unidentified fingerprints collected from the scene be uploaded to the FBI's national searchable database.

RESPECTFULLY SUBMITTED this 22nd day of September, 2022.

//

//

//

JON M. SANDS
Federal Public Defender

Cary Sandman
Nathan Maxwell
Assistant Federal Public Defenders

s/Cary Sandman
Counsel for Defendant

**Certificate of Service**

I hereby certify that on September 22nd, 2022, an original and copies of the foregoing Motion for Postconviction DNA and Advanced Forensic Testing was electronically filed with:

Clerk of the Maricopa County Superior Court
Phoenix, Arizona 85003

And emailed to:

Jeffrey L. Sparks
Assistant Attorney General
Arizona Attorney General's Office
Jeffrey.Sparks@azag.gov

Capital Litigation Docket
Arizona Attorney General's Office
CLDocket@azag.gov


s/Daniel Juarez
Assistant Paralegal

EXHIBIT B

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 0000-121686                                    10/21/2022

CLERK OF THE COURT
HONORABLE JENNIFER E. GREEN                        A. Gonzalez
                                                   Deputy


STATE OF ARIZONA                          JEFFREY LEE SPARKS

v.

MURRAY HOOPER (C)                         CARY S SANDMAN
                                          THOMAS J PHALEN
                                          KELLY CULSHAW
                                          NATHAN ALEXANDER MAXWELL

                                          CAPITAL CASE MANAGER
                                          COURT ADMIN-CRIMINAL-PCR
                                          JUDGE GREEN
                                          VICTIM WITNESS DIV-AG-CCC


UNDER ADVISEMENT RULING / CAPITAL CASE PCR

The Court has considered the following: Defendant's Motion for Postconviction DNA and Advanced Forensic Testing, filed September 22, 2022; State's Response to Motion for Post-Conviction DNA and Advanced Forensic Testing, filed September 30, 2022; and Defendant's Reply in Support of Postconviction DNA and Advanced Forensic Testing, filed October 11, 2022. The State had no objection to the untimely filing of the Reply, and the Court granted the Request to File Untimely Reply. The Court also considered the parties' argument on October 19, 2022 and took the matter under advisement.

## FACTUAL AND PROCEDURAL HISTORY

The facts, as set out by the Arizona Supreme Court, are as follows:

Pat Redmond and Ron Lukezic were partners in a successful printing business called Graphic Dimensions. In the summer of 1980, Graphic Dimensions was presented with the possibility of some lucrative printing contracts with certain hotels in Las Vegas. These deals fell through, however, when Pat Redmond and perhaps Ron Lukezic vetoed the idea.

In September of 1980, Robert Cruz asked Arnold Merrill if he would kill Pat Redmond for $10,000. Merrill declined. Cruz wanted Redmond killed in order to get Redmond's interest in Graphic Dimensions. Cruz ultimately planned to have Ron Lukezic killed as well and take complete control of Graphic Dimensions. In early December of 1980, Cruz and Merrill went to the Phoenix Airport and picked up [William Bracy] and [Defendant] who arrived on a flight from Chicago. Cruz and Merrill then took [Bracy] and [Defendant] to a hotel in Scottsdale, and Cruz gave [Bracy] a key to one of the rooms.

[Bracy] and [Defendant] stayed in the Valley for several days, during which time Merrill drove the two men to various locations. On one occasion, Merrill took [Bracy] and [Defendant] to see Cruz, and Cruz gave [Bracy] a stack of $100 bills, some of which [Bracy] gave to [Defendant]. That same day Merrill, at Cruz's direction, took [Bracy] and [Defendant] to a gun store owned by Merrill's brother, Ray Kleinfeld. [Defendant] picked out a large knife and [Bracy] told Kleinfeld to put it on Cruz's account. Kleinfeld gave [Bracy] a paper bag containing three pistols. [Bracy], [Defendant], and Merrill subsequently drove to the desert, where [Bracy] took target practice with the guns while [Defendant] rested in the back of Merrill's car. [Bracy] and [Defendant] later moved from the hotel into Merrill's house, where they met Ed McCall.

A few days later, [Bracy], [Defendant], and Merrill followed Pat Redmond's car as Redmond left a bar. When they neared Redmond's car, [Defendant] attempted to shoot Redmond. The attempt failed, however, when Merrill, who was driving, intentionally swerved the car. Cruz, [Bracy], and [Defendant] were upset at Merrill for his actions. After the failed attempt, [Bracy] and [Defendant] moved out of Merrill's home and into the apartment of Valinda Lee Harper and Nina Marie Louie, two women Merrill had introduced to [Bracy] and [Defendant]. On December 8, 1980, McCall told Merrill he was "joining up" with [Bracy] and [Defendant]. [Bracy] and [Defendant] returned to Chicago shortly thereafter.

[Bracy] and [Defendant] returned to Phoenix on December 30, 1980. On the evening of December 31, 1980 [Bracy], [Defendant], and McCall went to the Redmond home and forced their way in at gunpoint. Pat Redmond, his wife Marilyn, and Marilyn Redmond's mother, Helen Phelps, were present. [Bracy], [Defendant], and McCall eventually herded the Redmonds and Mrs. Phelps into the master bedroom where they bound, gagged, and robbed them. After forcing the Redmonds and Mrs. Phelps to lie face down on the bed, one or all of the intruders shot each victim in the head. One of the intruders also slashed Pat Redmond's throat. Pat Redmond and Mrs. Phelps died from their wounds, but Marilyn Redmond lived.

*State v. Bracy*, 145 Ariz. 520, 524–25 (1985).

CR 0000-121686                                               10/21/2022

In December of 1982, a jury found Defendant guilty of one count of conspiracy to commit first degree murder, two counts of first degree murder, one count of attempted first degree murder, three counts of kidnapping, three counts of armed robbery, and three counts of burglary in the first degree. As to the two counts of first degree murder, this Court found that the State proved five aggravating circumstances beyond a reasonable doubt, that Defendant had failed to prove any mitigating circumstances, and that Defendant should accordingly be sentenced to death. *State v. Hooper*, 145 Ariz. 538, 550 (1985). The Arizona Supreme Court affirmed Defendant's death sentences after conducting an independent review and a proportionality review. *Id*. at 550–51.

Defendant subsequently filed five petitions for post-conviction relief with this Court, all of which were denied. *See Hooper v. Shinn*, 985 F.3d 594, 612 (9th Cir. 2021). Defendant also initiated federal habeas proceedings during this time, but the District Court ultimately denied his petition and the Ninth Circuit affirmed the denial. *Id*. at 634. After the Supreme Court denied certiorari in that matter, the State filed a motion for a warrant of execution with the Arizona Supreme Court. The Arizona Supreme Court granted the State's motion on October 12, 2022, issued a warrant of execution, and set an execution date of November 16, 2022. *State v. Hooper*, No. CR-83-004-AP (Ariz. Oct. 12, 2022).

## LAW AND ANALYSIS

Defendant made two requests for post-conviction testing. First, Defendant asked the Court to order testing of fingerprint evidence "lifted from the crime scene" pursuant to A.R.S. §13-4241(A)(2). (Motion at 7-9.) Second, Defendant requested that the Court to order DNA testing of the "bloodied kitchen knife" pursuant to the mandatory testing provisions set forth in A.R.S. §13-4240(B) and the discretionary testing provisions permitted by A.R.S. §13-4240(C). (Motion at 9-12.)

### 1. Testing of Fingerprint Evidence Pursuant to A.R.S. §13-4241(A)(2)

Section 13-4241(A)(2) permits a defendant to request "any evidence" be "uploaded to the searchable local, state or national databases that are subject to the standards imposed by the agency that is responsible for managing the database." A.R.S. §13-4241(A)(2) (2022). The parties agreed that of the six to twelve fingerprints lifted from the scene, only one was identified and it was the victim Pat Redmond's print. (Motion at 8; Response at 8.) The parties also agreed that the fingerprints were visually compared, and better testing by way of digital testing is now available. (*Id*.) The statute requires that Defendant must "[meet] the requirements of this section," which include all of the following:

> 1. A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through the new forensic testing.

CR 0000-121686                                                10/21/2022

2. The evidence is still in existence and is in a condition that allows the new forensic testing to be conducted.

3. The evidence was not previously subjected to the new forensic testing or was not subjected to the analysis or comparison that is now requested.

As for the "reasonable probability . . . [that] the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through the new forensic testing," the Court considered the evidence in this case.

The Ninth Circuit Court of Appeals found "[the] prosecution presented overwhelming evidence of Hooper's guilt." *Hooper v. Shinn*, 985 F.3d 594, 603 (9th Cir. 2021). There, the Court found that no fingerprint tied Defendant or his co-defendants Bracy or McCall to the scene of the crime. (*Id.* at 602.) The victim who survived, Marilyn Redmond, "was the only one who saw the intruders in her home," later identified Defendant, Bracy, and McCall as the murderers, and provided details of the incident. (*Id.* at 603.) The victim was "elbow to elbow" with Defendant and she looked at him, and she described the clothing he wore, specifically, "a tan leather jacket, dark slacks, and a dark shirt." (*Id.*) The victim testified with "very specific details" including how the men forced their way into her home, and directed her to hold the family dog, close the drapes, and give them her jewelry, before Defendant taped the victims' hands behind their backs and gagged them. (*Id.*) After hearing McCall say "we don't need these two anymore," the victim testified that she heard two shots. (*Id.*)

In addition to the victim's testimony, the State presented the testimony of Nina Louie, who testified she met Defendant and co-defendant Bracy in early December 1980 in Phoenix, and that Bracy said he "had a big job to do" for $50,000 and that "it wasn't going to be very pretty." (*Id.* at 603.) Additionally, Louie testified that on New Year's Eve, the night of the murders, she "saw [Defendant], Bracy, and McCall at her apartment, that Defendant and Bracy were wearing "slacks and dark shirts," and that all three were armed with guns. (*Id.* at 603-04.) She noted that Defendant had a "large gun" "similar to a .357 magnum or a large-barrel .38." (*Id.* at 604.) Louie further asserted that "McCall let Harper use his car to drive Louie to work that night," and that Harper "needed to come back quickly because 'they had a very important appointment.'" (*Id.*)

Louie testified that the next day, McCall came to her apartment and relayed information about the murders, correcting a newscaster who stated that "Marilyn was not shot in the face but in the back of the head, like the other two; the victims were not tied up, but were taped; and only Redmond's throat had been slashed." (*Id.* at 604.) Louie stated that McCall informed her that Defendant was the one who shot Marilyn and cut Redmond's throat, and that "it was a professional job" and a "contract hit, not [a] robbery." (*Id.*) Police also found two drugstore receipts in McCall's vehicle that reflected three pairs of gloves and tape were bought on the day of the

murders. (*Id.*) An officer corroborated that Harper called the police the day after the murders and shared that Defendant, Bracy, and McCall were involved in the murders. (*Id.*) Harper also told police that she was with Bracy in Phoenix on New Year's Eve. (*Id.*)

Another witness Campagnoni testified that he saw Defendant and Bracy at Merrill's home on New Year's Eve and that "he saw Merrill give Bracy a piece of paper with directions to the Redmond home." (*Id.*) He further testified that after Defendant and Bracy left, a third person, Bauer, came to Merrill's home and "dropped off airline tickets with the names 'Sam Johnson' and 'Tony Jones.'" (*Id.*)

Campagnoni saw Defendant, Bracy, and McCall later that evening when they returned to Merrill's home, and the three "had jewelry, some of which looked similar to a ring and watch owned by Redmond." (*Id.*) Campagnoni drove Defendant and Bracy to the airport around midnight, and Bracy had the airline tickets that Bauer dropped off. Bracy told Defendant that Defendant would be "Sam Johnson" and that Bracy would be "Tony Jones." (*Id.*)

Merrill testified that the original plan was "to kill Redmond, including that [Merrill] had refused Cruz's offer to kill Redmond for $10,000." (*Id.*) Merrill provided details of Defendant and Bracy's "first trip to Arizona in early December 1980" wherein "he and Cruz picked up Defendant and Bracy from the Phoenix airport" and "took the men to the Gun Trader where they picked up three guns and [Defendant] picked out a knife, which was paid for by Cruz and looked like the same knife he found at the crime scene." (*Id.*) Merrill testified that he, Defendant, and Bracy followed Redmond from a bar, then "[Defendant] pointed his gun out the car window to shoot Redmond, but Merrill stopped [Defendant] from firing by turning into a parking lot." (*Id.*) After that, Defendant and Bracy "moved from Merrill's home into Harper's and Louie's apartment." (*Id*. at 605.)

Merrill testified as a cooperating witness and was "severely impeached"; he testified that on December 30, 1980, Cruz told him to McCall to pick up Defendant and Bracy from the airport and "to pick up a package from the Gun Trader." (*Id.*) Later that day, pursuant to Cruz's order, Merrill and Campagnoni "verified the addresses for the Redmond home and Graphic Dimensions." (*Id.*) He testified to the following sequence of events: the next morning, New Year's Eve, "McCall dropped off [Defendant] and Bracy at Merrill's home. McCall came back later that morning and left with [Defendant] and Bracy. Bauer came to Merrill's home in the afternoon and dropped off two American Airlines tickets from Phoenix to Chicago." (*Id.*) Merrill testified that "[Defendant], Bracy, and McCall came to his home around 8:30 p.m. on New Year's Eve," and "had with them several items that might have come from the Redmond home, including a watch, ring, and gun holster." (*Id.*) A few days later, "McCall told Merrill that he, [Defendant], and Bracy had committed the Redmond crimes" and that "McCall told Merrill that he was expecting a payment of $10,000 from Chicago for the murders." (*Id.*)

CR 0000-121686                                           10/21/2022

Telephone records corroborated that Defendant and Bracy were in Phoenix, not Chicago on New Year's Eve, and that "two phone calls were made from Merrill's home in Phoenix to Ann Harris's home in Chicago (Harris was the mother of [Defendant's] then-girlfriend)." (*Id.* at 606.) Further, "[o]ther records showed that Bracy made calls from his home in Chicago to Cruz's home in Illinois and the Gun Trader in the days before the murders." (*Id.*)

On these facts, the Court cannot find that "a reasonable probability exists that [Defendant] would not have been prosecuted or convicted if exculpatory results had been obtained through the new forensic testing." One of the prints in the Redmond home matched victim Redmond, but even if other prints lifted from the scene were tested with new and better equipment, and matched another person unconnected to the murders, that evidence would simply show that at some unknown time, another person was in the Redmond home. This seems more likely than not that other prints would be in a home the assailants had no reason to be in on New Year's Eve. If the prints were analyzed and matched another person, that would not create a "reasonable probability" that Defendant would not have been prosecuted or convicted. If the prints were analyzed and they showed a co-defendant was present, that fact would simply confirm the State's version of the case. If the prints were analyzed, and they showed the presence of someone involved to a lesser degree in the murders like Merrill or Campagnoni, the defense claimed at oral argument that the State's case or version of the events would fall "like a house of cards." The Court disagrees. The Court agrees that although a Merrill or Campagnoni fingerprint would be inconsistent with the State's version of the facts, the presence of a fingerprint from Merrill or Campagnoni in the Redmond home would not reveal when either Merrill or Campagnoni was in the home or for what purpose.

This Court cannot overlook the significant amount of evidence that shows Defendant committed these crimes. Although the Court agrees with the defense's claim that there was an "absence of any physical evidence," the Court cannot ignore the fact that the witness testimony from the surviving victim, Louie, Merrill, and Campagnoni. Their testimony taken as a whole is consistent, and the victim was in very close proximity to Defendant when he committed violent acts. Further, the Court finds compelling the evidence like receipts, phone calls, and plane tickets that corroborates the witness testimony and State's version of the facts. The Court agrees with the Ninth Circuit that the totality of evidence in this case "is overwhelming."

Having found that there is no "reasonable probability exists that [Defendant] would not have been prosecuted or convicted if exculpatory results had been obtained through the new forensic testing," the Court cannot grant the Defendant's request to test the fingerprint evidence.

Accordingly, the motion will be denied on that basis.

CR 0000-121686                                          10/21/2022

**2. DNA Testing of Knife Pursuant to A.R.S. §13-4240(B) and A.R.S. §13-4240(C)**

Defendant also urged the Court to grant the motion and order that the knife be tested for DNA. Defendant sought an order for DNA testing under both A.R.S. §§13-4240(B) and (C).

**a. A.R.S. §13-4240(B)**

Under subsection (B), the Court "shall order" DNA testing if all of the following apply:

1. A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through deoxyribonucleic acid testing.

2. The evidence is still in existence and is in a condition that allows deoxyribonucleic acid testing to be conducted.

3. The evidence was not previously subjected to deoxyribonucleic acid testing or was not subjected to the testing that is now requested and that may resolve an issue not previously resolved by the previous testing.

The Court turns its attention to the knife used to slash the victim's throat. The Court's analysis here parallels the analysis set forth in the request for fingerprint testing pursuant to A.R.S. §13-4241(A)(2). The Court finds that the evidence showed that the defendants obtained the knife from Gun Trader and evidence of another person's DNA on the knife would not create in this Court's mind "a reasonable probability that [Defendant] would not have been prosecuted or convicted if exculpatory results had been obtained through deoxyribonucleic acid testing." The Court previously found the evidence in this case was overwhelming and the Court will not repeat that analysis here. The evidence in this case was significant and in its totality, pointed to Defendant's guilt. As the Court previously found, the testimony of four witnesses (including one victim) was compelling and consistent, and was corroborated by drugstore receipts, phone calls, and airline tickets that put Defendant in Phoenix, not Chicago, on New Year's Eve in 1980.

Because the Court cannot find a "reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through deoxyribonucleic acid testing," the Court cannot grant Defendant's motion for DNA testing under that subsection.

Accordingly, the motion will be denied on that basis.

### b.  A.R.S. §13-4240(C)

Under subsection (C), the Court "may order" DNA testing if all of the following apply:

1. A reasonable probability exists that either:

> (a) The petitioner's verdict or sentence would have been more favorable if the results of deoxyribonucleic acid testing had been available at the trial leading to the judgment of conviction.

> (b) Deoxyribonucleic acid testing will produce exculpatory evidence.

2. The evidence is still in existence and is in a condition that allows deoxyribonucleic acid testing to be conducted.

3. The evidence was not previously subjected to deoxyribonucleic acid testing or was not subjected to the testing that is now requested and that may resolve an issue not previously resolved by the previous testing.

If the results of DNA testing had been available at trial, the Court cannot find that "the petitioner's verdict or sentence would have been more favorable."  The Court's analysis here is identical to the analysis set forth in the request for fingerprint testing pursuant to A.R.S. §13-4241(A)(2) and the request for DNA testing under A.R.S. §13-4240(B).  Even if the DNA testing showed another person touched the knife, that fact could merely support the fact that the knife was touched by another person at another time, unrelated to the murders.  The evidence showed the defendants obtained the knife at Gun Trader, where presumably many people including employees or customers could have touched a knife for sale. If the testing identified another person's DNA on the knife, that fact would have to be considered along with all the other evidence including the witness testimony and corroborating evidence that is consistent with the Ninth Circuit finding "overwhelming evidence of Defendant's guilt."  *Hooper*, 985 F.3d at 603.  The Court cannot find the verdict or the sentence "would have been more favorable" in light of so much evidence against Defendant, coupled with a reasonable explanation about why another person's DNA may have been on the knife.

As for the defense argument that a favorable DNA test would have caused the Court to render a more lenient sentence, if there was DNA from another person found on the knife, at best that would have allowed the defense to argue that perhaps another person or a  co-defendant was responsible for slashing the victim Pat Redmond's throat.  If it were a co-defendant, this might have allowed counsel for Defendant to argue he had a lesser role in the murders and his actions did not constitute "cruel, heinous, or depraved" conduct.  However, Merrill's testimony indicated

that Defendant "picked out the knife" obtained at the Gun Trader and it was similar to the one found at the crime scene. Additionally, if the DNA found on the knife belonged to Defendant, Bracy, or McCall, that would not be surprising as they were all involved in the murders and may have touched the knife at any point in the planning, execution of the murders or thereafter. If the DNA found on the knife belonged to Kleinfeld, that would not be surprising as he was involved in obtaining the knife from the Gun Trader. If the DNA found on the knife belonged to Merrill or Campagnoni, both were present with Defendant, Bracy, and McCall before and after the murders, and the presence of their DNA on one of the weapons would not negate the significant evidence from different sources against Defendant for his role in the murders. The Court does not find under these facts that a favorable DNA test, meaning detecting the presence of a co-defendant's DNA or another person's DNA, would have resulted in a different verdict or more lenient sentence for Defendant.

To the extent that the defense asked the Court to allow postconviction DNA testing pursuant to A.R.S. §13-4240(C)(1)(b), the record did not support a finding that DNA testing "*will* produce exculpatory evidence." A.R.S. §13-4240(C)(1)(b) (2022)(emphasis added.)

Accordingly, the motion will be denied on that basis.

THE COURT FINDS that Defendant has not met the statutory grounds for postconviction fingerprint testing pursuant to A.R.S. §13-4241(A)(2).

THE COURT FURTHER FINDS that Defendant has not met the statutory grounds for postconviction DNA testing pursuant to either A.R.S. §13-4240(B) or A.R.S. §13-4240(C).

IT IS ORDERED denying Defendant's Motion for Postconviction DNA and Advanced Forensic Testing.

EXHIBIT C

# ARIZONA SUPREME COURT

| | |
|---|---|
| MURRAY HOOPER, | No. |
| Petitioner, | Maricopa County Superior Court No. CR-0000-121686 |
| v. | Ninth Circuit No. 08-99024 |
| THE HONORABLE JENNIFER GREEN, Judge of the Superior Court of the State of Arizona in and for the County of Maricopa, | U.S. District Court No. CV-98-02164-PHX-SMM |
| Respondent Judge, | **(Capital Case)** |
| STATE OF ARIZONA, | **Expedited Ruling Requested** |
| Real Party in Interest. | |

## PETITION FOR SPECIAL ACTION

Jon Sands
Federal Public Defender

Cary Sandman (AZ No. 004779)
*Kelly L. Culshaw (OH No. 0066394; CA No. 304774)
Assistant Federal Public Defenders
850 W. Adams St., Suite 201
Phoenix, Arizona 85007
(602) 382-2816 (telephone)
(602) 889-3960 (facsimile)
Kelly_Culshaw@fd.org
Cary_Sandman@fd.org

*Admitted pro hac vice*

*Counsel for Murray Hooper*

## I.     Introduction

Petitioner Murray Hooper, through undersigned counsel, seeks this Court's special action review of the Maricopa County Superior Court's October 24, 2022 Order denying his request for DNA testing and advanced forensic fingerprint testing pursuant to A.R.S. §§ 13-4240 and 13-4241. The record demonstrates that Mr. Hooper satisfies the statutory requirements for *mandatory* testing and therefore the decision of the superior court is clearly erroneous as a matter of fact and law. This petition is brought pursuant to the Arizona Rules of Procedure for Special Actions to secure Mr. Hooper's rights to due process and the freedom from cruel and unusual punishment under the federal and Arizona Constitutions. U.S. Const. amends. V, VI, VIII, XIV; Ariz. Const. art. 2 §§ 4, 15, 24, 32 & 33.

This proceeding comes at a critical stage. This Court has issued a warrant for Mr. Hooper's execution, which is scheduled to be carried out on November 16, 2022. But it is not too late for Mr. Hooper to seek justice. There is forensic evidence that can be rapidly tested that can substantiate that he is an innocent man, as he has urged for over four decades. As explained below, expedited testing can reveal compelling exculpatory evidence, that in turn would give rise to a stay of Mr. Hooper's execution, and relief from his conviction or death sentence via postconviction proceedings, not subject to preclusion. *See* Arizona Rules of Criminal Procedure 32.1(e), 32.1(h), and 32.2(b). There is no conceivable justification for allowing Mr. Hooper's execution to go forward, without first testing innocence-determinative forensic evidence. Accordingly, for the reasons explained below, the Court should expedite its review, grant Mr. Hooper's Petition for Special Action, and reverse with instructions to grant the testing.

## II.     Jurisdictional Statement

This Court has jurisdiction through the Arizona Constitution, article VI, section 5(3).

Special action relief is immutably suitable here. Mr. Hooper faces a fast-approaching execution and there is insufficient time to employ the regular appellate process. Further, the superior court's refusal to allow testing, when on the facts here, the legislature has *mandated* such testing, implicates an issue of statewide importance very likely to arise in the future. *See, e.g.*, *Arizona Early Childhood Dev. & Health Bd. v. Brewer*, 221 Ariz. 467, 469–70, 212 P.3d 805, 807–08 (2009) (granting jurisdiction for a special action concerning legal issues of statewide importance, first impression, and interpretation of statutory amendment). This matter requires the interpretation and application of a recently-enacted statute, A.R.S. § 13-4241, and the outcome here is of statewide importance because it will have implications for factually innocent postconviction petitioners across Arizona. Therefore, special action jurisdiction is appropriate. Further, special action jurisdiction should be exercised when there is no "equally plain, speedy, and adequate remedy" by appeal. Ariz. R. P. Spec. Actions 8(a). In light of Mr. Hooper's imminent November 16, 2022 execution date, this Special Action Petition is the only speedy and adequate remedy.

## III. Statutory Provisions

### A. The Court is mandated to order testing of fingerprint evidence under A.R.S. § 13-4241

Arizona Revised Statute § 13-4241 provides that a person who was sentenced for a felony offense, and who meets the requirements of the statute, may request "[a]t any time" that evidence that is in the possession or control of the State, related to the investigation or prosecution, be either forensically tested with a technique that was not available at the time of sentencing and that is widely accepted in the scientific community via technological advances, A.R.S. § 13-4241(A)(1), or "[u]ploaded to searchable local, state or national databases that are subject to the standards imposed by the agency that is responsible for managing the database[,]"A.R.S. § 13-4241(A)(2).

The Court "shall" order the new testing after providing notice to the prosecutor and opportunity for a response, if the Court finds that the following apply:

1. A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through the new forensic testing.

2. The evidence is still in existence and is in a condition that allows the new forensic testing to be conducted.

3. The evidence was not previously subjected to . . . the analysis or comparison that is now requested.

4. The new forensic testing may resolve an issue that was not previously resolved by any other testing.

*See* A.R.S. § 13-4241(B)(1)–(4). Undersigned counsel have determined that the fingerprint evidence still exists and is within the State's custody for further forensic analysis. Therefore, for the reasons explained below, Mr. Hooper asks that fingerprints collected from various items and surfaces at the crime scene be "[u]ploaded to [the] searchable local, state or national databases that are subject to the standards imposed by the agency that is responsible for managing the database." *See* A.R.S. § 13-4241(A)(2). If they are not already in the database, Mr. Hooper requests that the fingerprints of the State's witnesses and the three alternative suspects be uploaded to the database prior to any search being conducted.

**B.      The Court should order DNA testing under A.R.S. § 13-4240**

Under A.R.S. § 13-4240(A), a person who was sentenced for a felony offense, and who meets the requirements of the statute, may request "[a]t any time" DNA testing of "any evidence that is in the possession or control of the court or the state, that is related to the investigation or prosecution [of the case]; and that may contain biological evidence." This evidence was identified by the police as a bloodied kitchen knife, which was collected at the Redmond home. (App. 31.) Undersigned counsel have determined that the kitchen kinfe still exists and is within the State's

custody for further forensic analysis. The testing requested would determine first whether any biological material remains on the item.

### 1. Mr. Hooper is entitled to testing under the "mandatory testing" provisions of A.R.S. § 13-4240(B)

The Court "shall order [DNA] testing" after providing the prosecutor with notice and opportunity to respond to the defendant's request if the Court determines these provisions apply: a reasonable probability exists that the petitioner would not have been prosecuted or convicted if DNA testing had produced exculpatory results; the evidence is still in existence, in a condition that allows DNA testing to be conducted; and the evidence was not subjected to the testing now requested, and that may resolve an issue not resolved by the previous testing. A.R.S. § 13-4240(B)(1)– (3).

## IV. Statement of the Issue

Like many cases raising actual innocence, Mr. Hooper's case presents issues of serious government misconduct, with accompanying perjurious testimony, and an unreliable eyewitness identification. Below, the superior court found the trial evidence so "overwhelming" that new forensic evidence would make no difference. (App. 9, 10.) The evidence was not overwhelming to the jury. It deliberated over the course of three days, before reaching a verdict. The standard applied by the superior court was severely flawed. Even if the evidence at Mr. Hooper's trial was overwhelming, that is not the test. The point of these proceedings is that if the jury had exculpatory results of forensic testing, the evidence would no longer have been "overwhelming"; the case either would never have been charged or if charged, there is a reasonable probability Mr. Hooper would not have been convicted.

The relevant point is this: the legislation mandates testing, *even if the trial evidence was* overwhelming, so long as forensic testing holds out just a reasonable probability that new evidence would have led to a different outcome. *See* A.R.S. § 13-4241; *see also* A.R.S. § 13-4240.

4

That the evidence before such forensic testing might seem incontrovertible misses the point and is not the basis to deny testing that may identify the actual offenders. But in Mr. Hooper's case that is what the superior court did. The superior court ignored that testing in Mr. Hooper's case may finally identify the actual offenders—the same paid government witnesses or their cohorts who framed Mr. Hooper in the first instance.

This Court should apply the correct standard and find that exculpatory testing results would, to a reasonable probability, have made the difference to the outcome of the State's decision to charge him and his conviction.

## V.    Statement of Material Facts

On December 31, 1980, William "Pat" Redmond and his mother-in-law, Helen Phelps, were shot and killed by three home invaders. *State v. Bracy*, 145 Ariz. 520, 525 (1985). Redmond's wife, Marilyn, was shot in the head but survived. *Id.* Ultimately, Mr. Hooper (and co-defendants William Bracy and Edward McCall) were convicted based on an Mrs. Redmond's eyewitness identification and the testimony of three paid government witnesses and co-conspirators who received extraordinary consideration and benefits from the State in exchange for their testimonies—including immunity, money, drugs, and unsupervised trips away from jail for conjugal visits.[1] (*See, e.g.*, Tr. 12/17/82 at 47; Tr. 12/20/82 at 25–26, 35–38, 54–55, 172; Tr. 7/21/83 at 63–68, 71–72, 83, 99–103; Tr. 12/16/82 16–19, 35–37, 40, 55–56; Tr. 11/29/82 a.m. at 24–26; Tr. 11/24/82 at 53–55; ROA 1167; Trial Ex. 209.) Mr. Hooper defended against the charges with alibi witnesses who testified he was in Chicago at the time of the offense.

There is evidence bearing on the lack of trustworthiness of Mrs. Redmond's eyewitness identification; sufficiently so, to at least support the potential viability of the requested forensic testing. Early on, Mrs. Redmond reported she had not looked

---

[1] Co-defendant, McCall, also made admissions as to his own involvement.

at the faces of the intruders and that they were wearing masks, so she would not have seen Mr. Hooper's face. (Tr. 11/30/82 p.m. at 73; Tr. 8/26/82 at 141–42; Tr. 11/8/82 p.m. at 71, 73; Tr. 11/3/82 at 171, 180, 184, 221–22, 230–31, 237–38; Tr. 8/27/82 at 69–70.) Her original statements concerning the assailants' race did not match the race of the three persons actually charged. Eventually, her statements changed to correspond to the races of those indicted. (*See, e.g.*, Tr. 11/3/82 at 222; Tr. 11/10/82 at 71.) Her eventual identification of Mr. Hooper at a lineup, some two months after the offense, was arranged and administered by Chicago Police detectives. The lineup identification is notable, if only for the level of Chicago Police corruption now known to have persisted in the early 1980s, including torture induced false confessions and other misconduct used to obtain false witness accusations and tainted, unreliable identifications by supposed eyewitnesses.[2]

Any suggestion that the Chicago based lineup would have been exempt from these corrupt influences is dubious.

Added to this, the modus operandi at the Redmond scene matched the modus operandi of other crimes committed by the very State sponsored witnesses who testified against Hooper. (*See, e.g.*, Tr. 11/10/82 at 74–79; Tr. 11/17/82 (Merrill cross) at 14; Tr. 11/24/82 at 125–26; Tr. 11/29/82 a.m. at 13; McCall Tr. 1/28/86 at

---

[2] This corruption, torture, and coercion practices are extensively documented and no longer disputable, having resulted in dozens of exonerations and hundreds of millions of dollars in civil lawsuit payouts to the victims. The Invisible Institute, a nonprofit journalism production company in Chicago, has made information detailing the corrupt and abusive practices publicly available via DropBox. *See, e.g.*, *Summary of Judicial, Executive, and Administrative Findings and Admissions Concerning Systemic Chicago Police Torture at Area 2 and 3*, The Invisible Institute, available at: https://www.dropbox.com/sh/ch5e6i674shwpr8/AAANdI2LMWFVsKJ-xB0pdtZDa/02.%20Torture.Findings.Admissions.Decisions.Docs.Opinions.Pleadi ngs?dl=0&preview=8.10.06.Summary+of+Judical%2C+Administrative+and+pros ecutorial+Findings+and+Admissions.wpd&subfolder_nav_tracking=1 (last visited Oct. 31, 2022).

10–12.) For example, this incident, like the other burglaries that McCall, Merrill, Gill, and Campagnoni were involved in, involved gaining entry to the house, taking jewelry to be pawned later by Merrill, and taping the hands of the victims with surgical tape. (*See, e.g.*, Tr. 11/10/82 at 74–79; Tr. 11/17/82 (Merrill cross) at 14; Tr. 11/24/82 at 125–26; Tr. 11/29/82 a.m. at 13; McCall Tr. 1/28/86 at 10–12.)

It is Mr. Hooper's contention that one or more of the State's paid witnesses and/or one of their cohorts, participated in these offenses and: (1) left their fingerprints inside the Redmond residence and/or (2) left DNA on the knife used during the crimes. Should any of the paid government witnesses (who insisted they never entered the Redmond home) have left their fingerprints inside the residence, that would prove they lied, and it would substantiate that they framed Mr. Hooper. Proof that the paid witnesses purjered themselves about who was actually present, would futher strip away Mrs. Redmond's already unreliable identification, while bolstering Mr. Hooper's alibi. The discovery of such exculpatory forensic evidence satisfies the statutory requirements for mandatory testing; which is to say that such evidence would demonstrate at least a reasonable probability that Mr. Hooper either would never have been charged, or even if charged, never convicted or sentenced to death.

## VI. The fingerprints

As many as twelve fingerprints were found at the crime scene. Only one fingerprint was identified; a print that belonged to a victim. (Tr. 11/15/82 at 10–13.) Of those twelve fingerprints, one was lifted from a metal tape spool found in the Redmond's bedroom. At trial, the State presented evidence that the medical tape used to restrain the Redmonds and Mrs. Phelps was bought specifically for this offense, at Long's Drug Store. (*See* Tr. 11/15/82 at 57; Tr. 11/23/82 at 43.) Marilyn Redmond testified that Mr. Hooper was the person who taped their hands behind their backs. (Tr. 11/30/82 p.m. at 45.) She also testified that the men who entered the home were not wearing gloves. (Tr. 11/30/82 p.m. at 69, 85.) Mrs. Redmond also

testified that Mr. Hooper accompanied her to the hall closet and searched it, where another fingerprint was lifted. (*See* Tr. 11/15/82 at 11; Tr. 11/30/82 p.m. at 38.) Other fingerprints were lifted throughout the Redmond home in places law enforcement expected the perpetrators might have touched. (Tr. 11/15/82 at 9.)

These fingerprints have never been run through local or national databases. In fact, the FBI's national database did not exist at the time of Mr. Hooper's 1982 trial, and fingerprint technology has changed dramatically since then. It was not until July 1999, nearly two decades after Mr. Hooper's trial, that the FBI's computerized Integrated Automated Fingerprint Identification System (IAFIS) came online. Privacy Impact Assessment Integrated Automated Fingerprint Identification System National Security Enhancements, at https://www.fbi.gov/how-we-can-help-you/need-an-fbi-service-or-more-information/freedom-of-informationprivacy-act/department-of-justice-fbi-privacy-impact-assessments/iafis-ngi-biometric-interoperability (last visited Oct. 31, 2022). This national system allowed for "storing, comparing, and exchanging fingerprint data in a digital format [which] permits comparisons of fingerprints in a faster and more accurate manner." *Id*. More than a decade later (and nearly 30 years after Mr. Hooper's trial) the FBI developed the Next Generation Identification (NGI) system. https://le.fbi.gov/science-and-lab-resources/biometrics-and-fingerprints/biometrics/next-generation-identification-ngi (last visited Oct. 30, 2022). The NGI brought the FBI's identification services "to the next level[,]" improving on "the efficiency and accuracy of biometric services[.]" *Id*. The NGI includes the Advanced Fingerprint Identification Technology (AFIT), which replaced IAFIS in February 2011. The AFIT increases both accuracy and capacity of the IAFIS's fingerprinting capabilities as well as improving system availability. *Id*. A new algorithm for fingerprint-matching was introduced, improving accuracy from 92% to 99.6%. *Id*. The statute specifies that testing is appropriate when, among other requirements elsewhere discussed, the "evidence was not previously subjected to the new forensic testing or was not subjected to the

analysis or comparison that is now requested." A.R.S. § 13-4241 (B)(3). The fingerprints here could not have been subjected to the comparative databases requested now, because neither the computer-based matching program itself nor the database of comparator fingerprints existed at the time of trial.

## VII. The knife

A bloodied kitchen knife (Trial Exhibit 7) used during the crime was also found at the scene, in the Redmond's bedroom. The State presented evidence that Mr. Hooper handled the kitchen knife extensively and used it to cut Mr. Redmond's throat. (*See* Tr. 11/23/82 at 44.) New, highly sensitive, DNA testing methods now exist that were not available at the time of the original trial—DNA testing did not exist in any form during Mr. Hooper's trial. Removing the knife from Mr. Hooper's hand and placing in the hands of the real perpetrator—one of the paid informants— would undermine his conviction. And because the knife was central to the trial court's finding of the especially heinous, atrocious, and cruel factor, it would also strip yet another aggravating factor, and in all reasonable probability would change the sentencing balance in favor of life.

The superior court denied Mr. Hooper's requests relying on the Ninth Circuit Court of Appeals finding that "[t]he prosecution presented overwhelming evidence of Hooper's guilt[,]" *Hooper v. Shinn*, 985 F.3d 594, 603 (9th Cir. 2021), to reject Mr. Hooper's requests under both statutes. (App. 7, 10–11.)

## VIII. Argument

The Ninth Circuit Court of Appeals finding that "[t]he prosecution presented overwhelming evidence of Hooper's guilt[,]" is not a ground for denying statutorily mandated testing once a prisoner demonstrates the new testing itself, in all reasonable probability, can achieve results which will undermine the basis for the initial prosecutor charging decision or the trial outcome itself. A.R.S. § 13-4241(B)(1)–(4). The superior court's conclusion that it would have made no difference, had new testing demonstrated that Mr. Hooper had been framed by the

paid and perjurious witnesses, whose fingerprints place them inside the residence, amounts to an abject violation of the statute, and sets a dangerous precedent that may result in the execution of an innocent man. This Court should reverse and direct the superior court to grant the requested testing forthwith.[3]

### A. The superior court's analysis was severely flawed and inadequate to undermine Hooper's right to mandatory testing under § 13-4241

The superior court found it uncontested that the fingerprints collected at the scene had previously been "visually compared" and that better forensic testing is now available. (App. 6.)

In considering whether there is a reasonable probability that Mr. Hooper would not have been prosecuted or convicted if exculpatory results were obtained, the superior court recounted at length the Ninth Circuit's opinion in *Hooper v. Shinn*, 985 F.3d 594. (App. 7–9.) The superior court's consideration of the potentially exculpatory results that could be produced from the requested fingerprint testing encompassed a solitary line of analysis:

> The Court agrees that although a Merrill or Campagnoni's fingerprint would be inconsistent with the State's version of the facts, the presence of a fingerprint from Merrill or Campagnoni in the Redmond home would not reveal when either Merrill or Campagnoni was in the home or for what purpose.

(App. 9.)

The superior court's finding ignores the compelling but necessary inference from such exculpatory evidence: forensic evidence proving that Merrill or

---

[3] Undersigned counsel have been advised by the DPS Crime Lab that this testing can be completed before Mr. Hooper's scheduled execution, but the window is narrowing. DPS has indicated the fingerprint testing Mr. Hooper requests can be completed very rapidly, as it simply involves loading and running previously collected fingerprints into the local and national fingerprint databases. DPS has indicated it will take roughly one week to conduct the DNA testing and another week to prepare its report. On the other hand, getting an exculpatory hit on the fingerprints may obviate the DNA testing.

Campagnoni was inside the residence demonstrates in an absolute sense that they committed perjury. They denied participating in the crime and denied ever being in the residence. (Tr. 11/18/82 at 49; Tr. 11/24/82 at 104–05.) The next necessary inference is that no reasonable juror would have believed their perjured testimony, framing Mr. Hooper. And with evidence that Mrs. Redmond was mistaken about who was actually present inside the home, together the new exculpatory evidence shows at the least a reasonable probability Mr. Hooper either would never have been charged, or if charged, convicted or sentenced to death.

The superior court's failure to draw the necessarily obvious and compelling inferences from the evidence, resorting to wondering about when and why the perjurers were inside the residence, reveals an abuse of discretion and a disregard of the mandatory testing provisions in A.R.S. § 13-4241.

1. **The court used the Ninth Circuit's account of the trial evidence to deny Mr. Hooper's request for DNA testing of the knife.**

The superior court also denied Mr. Hooper's requested DNA testing of the knife, which was "used to slash the victim's throat[ ]" (App. 10), under both the "mandatory" testing provisions, A.R.S. § 13-4240(B)(1) and the permissive provisions, *id.* at (C)(1)(a), (b).

The court denied Mr. Hooper's request, despite recognizing that the knife was used on one victim. As the court explained, one of the trial witnesses, Nina Louie, a witness who was not present at the time of the murders, testified that one of the three codefendants, Edward McCall, told her that Mr. Hooper cut the victim's throat. (App. 7.) The court then concluded that the evidence "was significant and in its totality, pointed to Defendant's guilt." (App. 10.) The court found that "the totality" of the witness evidence and various paper documents (*e.g.*, receipts) "pointed" to Mr. Hooper's guilt. (App. 10.) This is clearly an erroneous finding: the receipts were tied to McCall (not Mr. Hooper) because they were found in McCall's car. Mr.

Hooper was never identified as one of the Black men with McCall in the Long's Drug store. (Tr. 11/15/82 at 52–65.) Moreover, testimony provided at trial only showed that plane tickets were purchased, but not who used them for travel. (Tr. 11/15/82 at 147–48.) Lastly, the phone calls likewise did not place Mr. Hooper in Phoenix on New Year's Eve. They simply show that someone, like Merrill (since it was his house) or Campagnoni, made calls to that Chicago number, perhaps trying to contact Mr. Hooper.

Postconviction forensic evidence is precisely the type of evidence that can counter circumstantial evidence that "points" to a defendant. Here, for example, if, instead of Mr. Hooper, Arnie Merrill or George Campagnoni's DNA is on the knife used "to slash the victim's throat," that evidence once more shows Mrs. Redmond's identification—that the three men in her home were Mr. Hooper, Bracy, and McCall—was wrong and illuminates another lie within the State's paid informants' testimony by placing one of these three friends in the scene of the crime with no reason to be there. As with the fingerprint evidence, the superior court's failure to draw obvious inferences from exculpatory DNA evidence demonstrates an abuse of discretion. And because exculpatory DNA has the potential to show a reasonable probability that Hooper would never have been charged or convicted, testing is mandated.

## IX.  Conclusion

Testing could place Merrill or Campagnoni's fingerprint or DNA at the scene, or one of the alternative suspects. The jury would have been able to consider that evidence in conjunction with Mr. Hooper's alibi witnesses, and with the State's circumstantial evidence. Merrill's, Campagnoni's, or one of the alternative suspects' fingerprints or DNA in the Redmond's home would have severely undermined the State's case. Moreover, in the DNA context, this Court has made clear that the "results need not be completely exonerating[.]" *State v. Gutierrez*, 229 Ariz. 573, 578, ¶ 28, 278 P.3d 1276, 1281 (2012). Of course there *was* evidence linking Mr.

Hooper to these offenses presented at trial; he would not have been convicted or sentenced to death for these crimes without such evidence. He would not need to request this testing but for the fact of his conviction. Given witness testimony that Mr. Hooper is the person who taped the victims' hands and cut Mr. Redmond's throat, testing results suggesting that Merrill, Campagnoni, or one of the alternative suspects taped the victims' hands or used the knife would be extraordinarily favorable. *See id.* The superior court failed to apply the facts and necessary inferences from those facts to A.R.S. §§ 13-4240 and 13-4241.

For the foregoing reasons, Mr. Hooper respectfully asks that the Court grant his Petition for Special Action, reverse the order of the Maricopa County Superior Court denying DNA and advanced forensic testing, and direct that court to order such testing.

RESPECTFULLY SUBMITTED this 31st day of October, 2022.

Jon Sands
Federal Public Defender

Cary Sandman (AZ No. 004779)
*Kelly L. Culshaw (OH No. 0066394; CA No. 304774)
Assistant Federal Public Defenders
850 W. Adams St., Suite 201
Phoenix, Arizona 85007
(602) 382-2816 (telephone)
(602) 889-3960 (facsimile)
Kelly_Culshaw@fd.org
Cary_Sandman@fd.org

*Admitted pro hac vice*

*Counsel for Murray Hooper*

# EXHIBIT D

SUPREME COURT OF ARIZONA

| | | |
|---|---|---|
| MURRAY HOOPER, | ) | Arizona Supreme Court |
| | ) | No. CV-22-0259-SA |
| Petitioner, | ) | |
| | ) | Maricopa County |
| v. | ) | Superior Court |
| | ) | No. CR-0000-121686 |
| THE HONORABLE JENNIFER GREEN, | ) | |
| JUDGE OF THE SUPERIOR COURT OF | ) | United States Court of |
| THE STATE OF ARIZONA in and for | ) | Appeals, Ninth Circuit |
| the County of Maricopa, | ) | No. 08-99024 |
| | ) | |
| Respondent Judge, | ) | United States District |
| | ) | Court |
| STATE OF ARIZONA, | ) | No. CV-98-02164-PHX-SMM |
| | ) | |
| Real Party in Interest. | ) | **FILED: 11/10/2022** |
| _____ | ) | |

**DECISION ORDER**

*Per Curiam*

On September 22, 2022, Petitioner Murray Hooper filed a Motion for Post-Conviction DNA and Advanced Forensic Testing with the Maricopa County Superior Court. Petitioner asked the superior court to order testing of fingerprint evidence "lifted from the crime scene" pursuant to A.R.S. § 13-4241(A)(2). Motion at 7-9. Petitioner also requested that the superior court order DNA ("deoxyribonucleic acid") testing of the "bloodied kitchen knife" pursuant to both the mandatory testing provisions set forth in A.R.S. § 13-4240(B) and the discretionary testing provisions permitted by A.R.S. § 13-4240(C). Motion at 9-12.

After reviewing the facts and evidence presented at trial, making specific factual findings, and "agree[ing] with the Ninth Circuit that the totality of the evidence [showing Hooper's guilt] in this case 'is overwhelming,'" the superior court found that "no 'reasonable probability exists that [Petitioner] would not have been prosecuted or convicted if exculpatory results had been obtained through the new forensic testing,'" and therefore, denied Petitioner's motion for advanced testing of the fingerprint evidence.

Next, based on the court's analysis that parallels its analysis of Petitioner's request for fingerprint testing pursuant to A.R.S. § 13-4241(A)(2), the superior court found that "evidence of another person's DNA on the knife—[exculpatory evidence]—would not create. . . 'a reasonable probability that [Petitioner] would not

have been prosecuted or convicted. . ." and therefore, the court held it "cannot grant [Petitioner's] motion for DNA testing under [§ 13-4240(B)]" and denied the motion.

Based on its analysis being "identical to the analysis of Petitioner's request for fingerprint testing pursuant to A.R.S. § 13-4241(A)(2) and the request for DNA testing under A.R.S. § 13-4240(B)," the superior court held it "cannot find that the petitioner's verdict or sentence would have been more favorable." Specifically, the court held that it "cannot find the verdict or the sentence 'would have been more favorable' in light of so much evidence against [Petitioner], coupled with a reasonable explanation about why another person's DNA may have been on the knife."

Further, the court held that it "does not find under these facts that a favorable DNA test, meaning detecting the presence of a co-defendant's DNA or another person's DNA [on the knife], would have resulted in a different verdict or more lenient sentence for [Petitioner]." Finally, the superior court held that "[t]o the extent that [Petitioner] asked the Court to allow postconviction DNA testing pursuant to A.R.S. § 13-4240(C)(1)(b), the record [does] not support a finding that DNA testing '*will* produce exculpatory evidence'" and denied the motion. *See* A.R.S. §13-4240(C)(1)(b) (2022) (emphasis added).

Accordingly, the superior court found that Hooper "has not met the statutory grounds for postconviction fingerprint testing pursuant to A.R.S. § 13-4241(A)(2)" and "has not met the statutory grounds for postconviction DNA testing pursuant to either A.R.S. § 13-4240(B) or A.R.S. § 13-4240(C)," and therefore, the court denied the motion for post-conviction DNA and advanced forensic testing.

This Court has considered Hooper's Petition for Special Action and Appendices, State's Response, Hooper's Reply, and the *Amicus Curiae* Brief in Support of Petitioner filed by Arizona Attorneys for Criminal Justice and the Arizona Capital Representation Project. Petitioner asserts that the superior court abused its discretion and exceeded its authority in denying his request for post-conviction fingerprint and DNA testing pursuant to A.R.S. §§ 13-4240 and -4241. However, Petitioner has failed to demonstrate that the superior court abused its discretion, or made legally untenable rulings, incorrect factual findings, or denied Petitioner justice.

## **Jurisdiction**

The Court has jurisdiction pursuant to Arizona Constitution, article VI, section 5(3). Hooper's petition raises questions that require the Court to interpret and apply A.R.S. § 13-4240, § 13-4241, a recently enacted statute, and Ariz. R. Crim. P. 32.17, and the

outcome is of statewide importance because the questions before the Court have implications for post-conviction motions for DNA and advanced forensic testing across Arizona. Therefore, special action jurisdiction is appropriate, and should be exercised because Hooper has no "equally plain, speedy, and adequate remedy." Ariz. R.P. Spec. Act. 8(a).

## Standard of Review

In reviewing a trial court's order in the context of a special action, this Court must find that the superior court abused its discretion or exceeded its jurisdiction or legal authority before granting relief. *Twin City Fire Ins. Co. v. Burke*, 204 Ariz. 251, 253 ¶ 10 (2003); Ariz. R.P. Spec. Act. 3. "The special action requests extraordinary relief, and acceptance of jurisdiction of a special action is highly discretionary with the court to which the application is made." Ariz. R.P. Spec. Act. 3, State Bar Comm. Note; *see, e.g., State v. Simon*, 229 Ariz. 60, 61 ¶ 4 (App. 2012) ("Our special action jurisdiction is discretionary.") (quotations omitted).

## The Superior Court Did Not Abuse its Discretion

Section 13-4240(B) provides, in pertinent part, that "the court shall order deoxyribonucleic acid testing if. . . [a] reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through deoxyribonucleic acid testing." A.R.S. § 13-4240(B)(1).

Section 13-4240(C) provides, in pertinent part, that "the court may order deoxyribonucleic acid testing if. . . [a] reasonable probability exists that either: (a) [t]he petitioner's verdict or sentence would have been more favorable if the results of deoxyribonucleic acid testing had been available at the trial leading to the judgment of conviction, [or] (b) [d]eoxyribonucleic acid testing will produce exculpatory evidence." A.R.S. § 13-4240(C)(1)(a), (b).

Section 13-4241(B) provides, in pertinent part, that "the court shall order the new forensic testing if. . . [a] reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through the new forensic testing." A.R.S. § 13-4241(B)(1).

Ariz. R. Crim. P. 32.17 provides, in pertinent part, that "the court must order DNA testing if the court finds that. . . a reasonable probability exists that the defendant would not have been prosecuted, or the defendant's verdict or sentence would have been more favorable, if DNA testing would produce exculpatory evidence." Ariz. R. Crim. P. 32.17(d)(1)(A).

Hooper contends that the proper analysis is "if the jury had exculpatory results of forensic testing. . . the case either would never have been charged or if charged, there is a reasonable probability [ ] Hooper would not have been convicted." Similarly, Hooper argues that § 13-4240(B) and § 13-4241(B) "mandate[] testing, *even if the trial evidence was* overwhelming, so long as forensic testing holds out just a reasonable probability that new evidence would have led to a different outcome" or to a more favorable verdict. Hooper is incorrect.

The proper analysis requires the court to order the requested DNA testing if a reasonable probability exists that the petitioner would not have been prosecuted or convicted *if exculpatory results had been obtained through [DNA] testing.* A.R.S. § 13-4240(B) (emphasis added). The wording of, and more importantly the punctuation in Ariz. R. Crim. P. 32.17 provides clarity for how courts should review a request for DNA testing. Rule 32.17 provides that "the court must order DNA testing if the court finds that. . . [a] reasonable probability exists that the defendant would not have been prosecuted, or the defendant's verdict or sentence would have been more favorable*, if DNA testing would produce exculpatory evidence.*" Ariz. R. Crim. P. 32.17(d)(1)(A) (emphasis added).

Here, the superior court applied the proper analysis and concluded, because the trial testimony was "compelling and consistent, and was corroborated" by circumstantial and other physical evidence, even if the DNA testing resulted in exculpatory evidence (i.e., evidence inculpating other persons), there is not a reasonable probability that Hooper would not have been prosecuted or convicted.

Moreover, while Hooper's dispute with the probative value of each individual piece of evidence and arguments that each is less than compelling are well taken, the superior court's finding that the "totality" of the evidence was significant and pointed to Hooper was not an abuse of discretion. Likewise, Hooper's argument that the superior court abused its discretion by failing "to draw obvious inferences from [potentially] exculpatory DNA evidence," incorrectly focuses on the *possibility* that Merrill's or Campagnoni's DNA *might be* present on the knife. Hooper fails to account for the fact the superior court found that the *possibility* another person's DNA *might be* present on the knife, when coupled with the "overwhelming evidence" of Hooper's guilt presented at trial (and in the Court's opinion is not exculpatory based on the complete facts of this case), does not create a reasonable probability that Hooper would not have been prosecuted or convicted, or that he would have received a more favorable verdict or sentence. *See* Maricopa Cnty. Sup. Ct. M.E. dated 10-21-2022 (docketed 10-24-2022), at 9 (discussing that the presence

of Bracy, McCall, Campagnoni, Merrill, or Kleinfeld's DNA on the
knife "would not negate the significant evidence from different
sources against [Hooper] for his role in the murders"); *see also
Hooper v. Shinn*, 985 F.3d 594, 602-04 (9th Cir., January 8, 2021)
(the Ninth Circuit Court of Appeals' discussion of the "overwhelming
evidence" of Hooper's guilt presented by the State).

The superior court's analysis and conclusion pursuant to
§ 13-4240(C) that exculpatory DNA results would not create a
reasonable probability that Hooper would not have been prosecuted or
convicted or that he would have received a more favorable verdict or
sentence was not an abuse of discretion. Furthermore, the superior
court was within its discretion when it held that it could not "find
the verdict or the sentence 'would have been more favorable' in light
of so much evidence against [Hooper]." Coupled with a reasonable
explanation about why another person's DNA may have been on the
knife, this application of § 13-4240(C) by the superior court was not
an abuse of discretion.

Hooper is also incorrect when he argues that when a petitioner
requests advanced forensic testing—here, of fingerprints found in the
Redmonds' home—the court is required to order the testing, "*even if
the trial evidence was* overwhelming, so long as forensic testing
holds out just a reasonable probability that new evidence would have
led to a different outcome." Here, the superior court applied the
correct analysis: Whether Hooper had established, if potentially
exculpatory results (i.e., someone else's fingerprints at the crime
scene) were obtained through fingerprint testing, is there a
reasonable probability he would not have been prosecuted or
convicted.

Here, the superior court acknowledged that a determination
through advanced fingerprint analysis that Merrill's or Campagnoni's
fingerprints were in the residence would be inconsistent with the
State's version of the facts, but found that even that fact would not
outweigh the overwhelming evidence establishing Hooper's guilt, and
therefore did not establish a reasonable probability Hooper would not
have been prosecuted or convicted. Hence, Hooper has failed to
establish that the superior court abused its discretion when it
denied his request for forensic testing pursuant to § 13-4241(A)(2)
based on the showing required in § 13-4241(B)(1).

Therefore, upon consideration,

**IT IS ORDERED** that the Court accepts special action
jurisdiction of Hooper's Petition for Special Action.

**IT IS FURTHER ORDERED** that the Court affirms the superior
court's finding that Hooper has not met the statutory grounds for

post-conviction fingerprint testing pursuant to A.R.S. § 13-4241 and has not met the statutory grounds for post-conviction DNA testing pursuant to either A.R.S. § 13-4240(B) or A.R.S. § 13-4240(C).

**IT IS FURTHER ORDERED** that the Court affirms the superior court's order denying Hooper's motion for post-conviction DNA and advanced forensic testing.

DATED this 10th day of November, 2022.

For the Court:

_____/s/_____
ROBERT BRUTINEL
Chief Justice

Vice Chief Justice Timmer, Justice Lopez, and Justice Beene did not participate in the determination of this matter.

TO:
Jon M Sands
Cary S Sandman
Kelly L Culshaw
Jeffrey L Sparks
David E Ahl
Hon Jennifer E Green, Judge
Jennifer E Green
Therese Day
Jason Lewis
Amy Armstrong
Murray Hooper, ADOC 047621, Arizona State Prison, Florence - Eyman
    Complex-Browning Unit (SMU II)
Amy P Knight
Emily Skinner