MARK BRNOVICH
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

JEFFREY L. SPARKS (AZ BAR NO. 027536)
GINGER JARVIS (AZ BAR NO. 014487)
LAURA P. CHIASSON (AZ BAR NO. 019025)
DAVID E. AHL (AZ BAR NO. 029212)
ASSISTANT ATTORNEYS GENERAL
CAPITAL LITIGATION SECTION
2005 N. CENTRAL AVENUE
PHOENIX, ARIZONA 85004
TELEPHONE: (602) 542-4686
CLDOCKET@AZAG.GOV

ATTORNEYS FOR DEFENDANT MARK BRNOVICH

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Murray Hooper,<br><br>Plaintiff,<br><br>-vs-<br><br>Mark Brnovich, et al.,<br><br>Defendants. | No. CV 22–01923–PHX–SMM<br><br>**RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT**<br><br>**[CAPITAL CASE]**<br><br>**EXECUTION SCHEDULED FOR NOVEMBER 16, 2022 AT 10:00 A.M. (MST)** |

After spending four decades challenging his convictions and sentences in state and federal court, and only days before his November 16, 2022, execution, Plaintiff Murray Hooper filed a Complaint and Motion for Temporary Restraining Order or Preliminary Injunction seeking a stay of execution based on the Arizona courts' denial of his request for postconviction forensic testing under an Arizona statute. This Court should deny Hooper's motion because he has not established a likelihood that he will succeed on the merits of his claims, that he will suffer irreparable harm, that "the balance of equities tips in his favor," or that "an injunction is in the public interest." *Benisek v. Lamone,* 138 S. Ct. 1942, 1944 (2018) (quotation marks omitted).

I. **BACKGROUND.**

   A. *Hooper's Crimes.*

On New Year's Eve 1980, Hooper, William Bracy, and Ed McCall forced their way at gunpoint into the home of Pat Redmond and his wife Marilyn Redmond. *Hooper v. Shinn (Hooper II)*, 985 F.3d 594, 599 (9th Cir. 2021). Pat, Marilyn, and Marilyn's mother, Helen Phelps, were inside preparing for a holiday dinner. Hooper and the other two intruders demanded valuables, forced the victims to lie face down on the bed in the master bedroom, and then bound and gagged the victims. The intruders then shot each victim in the head and slashed Pat Redmond's throat. Pat and Helen died, but Marilyn survived. *Id.*

Robert Cruz, the head of a Chicago crime organization, had hired the three perpetrators to kill Pat Redmond because Cruz wanted an interest in Pat's business but Pat had rejected Cruz's business offers. *Id.* at 600. Cruz first offered Arnold Merrill $10,000 to kill Pat, but Merrill refused him. *Id.* Cruz then flew Hooper and Bracy to Phoenix from Chicago, where they lived, to carry out the crime. *Id.* Merrill assisted by driving Hooper and Bracy around Phoenix, including to collect money from Cruz and to a gun store to obtain the murder weapons, letting Hooper and Bracy stay at his home for a period of time, and giving Bracy directions to Pat's home. *Id.* at 600–01. Immediately after the murders, Hooper, Bracy, and McCall went to Merrill's home before Hooper and Bracy were driven to the airport to fly back to Chicago. *Id.* at 601.

The day after the murders, McCall admitted to two women, Valinda Lee Harper and Nina Marie Louie (whom Merrill had introduced to Hooper and Bracy before the murders and in whose apartment the killers had been before leaving to commit the murders), how the murders had been committed, stating that it was a "contract … hit, not a robbery," and that Hooper had slashed Pat's throat and shot Marilyn. *Id.* McCall also described the crimes to Merrill. *Id.* On January 1, 1981,

Harper called the police and told them Hooper, Bracy, and McCall had committed the murders. *Id.* at 601–02.

Marilyn initially told a responding police officer that "[t]hree black men came in and robbed us," but then stated that two of the intruders were black and one was white. *Id.* at 601. She also told police that one of the black males wore a tan leather jacket with dark pants. *Id.* Fifty-three days after the murders, Marilyn flew to Chicago where she identified Hooper and Bracy in lineups. *Id.* at 602.

### B. Trial.

Hooper and Bracy were each charged with conspiracy to commit first-degree murder, two counts of first-degree murder, one count of attempted first-degree murder, three counts of kidnapping, three counts of armed robbery, and one count of first-degree burglary. *Id.* They were tried together. *Id.*

"The prosecution presented overwhelming evidence of Hooper's guilt." *Id.* at 603. "Marilyn provided very specific details about her lengthy encounter with the murderers," and identified Hooper, Bracy, and McCall as the killers. *Id.* "Her in-court identifications were certain, and she did not waiver when the defense suggested she could be mistaken." *Id.*

Louie testified that she met Hooper and Bracy in December 1980 and that she overheard Bracy say that "he had a big job to do" for $50,000 and that "it wasn't going to be very pretty." *Id.* Hooper, Bracy, and McCall were at her apartment on New Year's Eve armed with guns, and Bracy said that they had "some business to take care of." *Id.* at 603–04. The next day, Louie testified, McCall came to her apartment and told her Marilyn was shot in the back of the head (not the face as a newscaster stated), that the victims were taped rather than tied up, and that only Pat's throat was slashed. *Id.* at 604. He also said that all three men wore gloves and that Hooper had shot Marilyn and cut Pat's throat. *Id.* Louie's testimony was corroborated by receipts found in McCall's vehicle for the purchase of three pairs of gloves and tape the day of the murders, testimony that a

3

vehicle matching McCall's was seen near the Redmond home around the time of the murders, and testimony that Harper called police the day after the murders and implicated Hooper, Bracy, and McCall. *Id.*

Another witness, George Campagnoni, testified that on New Year's Eve he saw Merrill give Bracy a piece of paper with directions to the Redmond home and Pat's business and that he saw Hooper, Bracy, and McCall later that evening at Merrill's home with jewelry, "some of which looked very similar to a ring and watch owned by [Pat] Redmond." *Id.*

Merrill also testified. He explained Cruz's plan to have Redmond killed and said he refused Cruz's offer to kill Redmond for $10,000. *Id.* He described Hooper and Bracy's first trip to Phoenix in early December, during which he saw Cruz give the pair a stack of cash, took Hooper and Bracy to a gun shop where they picked up weapons (including a knife that looked like a knife found at the crime scene), and was present for Hooper's attempt to shoot Redmond from a car window which Merrill foiled by turning the vehicle. *Id.* Merrill also testified that, on December 30, he picked up Hooper and Bracy from the Phoenix airport at Cruz's direction and verified the addresses for Redmond's home and business. *Id.* at 605.

Merrill testified that Hooper, Bracy, and McCall came to his home at about 8:30 p.m. on New Year's Eve and had items (including a watch, ring, and gun holster) that may have come from the Redmond home. *Id.* McCall told him several days later that McCall, Hooper, and Bracy had committed the crimes at the Redmonds' home. *Id.*

In addition to these witnesses, the State presented other evidence, including testimony from employees of Pat Redmond's business who saw Cruz touring the company in 1980; testimony of a pilot whom Cruz hired on occasion who testified that in 1980 he heard Cruz say he wanted to take over a printing business and would have to "get rid of" an uncooperative business partner; testimony from a

4

witness who purchased two tickets at Cruz's direction from Phoenix to Chicago for a flight on New Year's Eve and delivered them to Merrill's home; telephone records that supported that Hooper and Bracy were in Phoenix during the murders, rather than Chicago; and evidence from which the jury "could infer that Hooper possessed both the murder weapon and the knife that was used to slash Redmond's throat." *Id.* at 606.

> In their defense, Hooper and Bracy presented several alibi witnesses:
>
> Hooper's witnesses included Mary Jean and Michael Wilson, two friends of Hooper's brother, who testified that they had seen and spoken with Hooper on the day of the murders at a flea market in Chicago. Nelson Booker, another friend of Hooper's brother, testified that he had seen and spoken with Hooper at a New Year's Eve party at a Chicago club.

*Id.* at 608. "The jury did not believe the alibis." *Id.* at 621 n.20. Moreover, "[e]vidence that Hooper and Bracy were both in Phoenix on New Year's Eve, and thus, that they had created fake alibis, provided additional evidence of Hooper's guilt." *Id.* at 621.

The jury found Hooper and Bracy guilty of all charged counts. After conducting the necessary sentencing-related hearings, the trial court concluded that Hooper should be sentenced to death for the two first-degree murder convictions. *Id.* at 609–10.

### C. *Subsequent proceedings.*

Hooper spent the next four decades challenging his convictions and sentences in both state and federal court. The Arizona Supreme Court affirmed Hooper's convictions and death sentence on direct appeal. *State v. Hooper (Hooper I)*, 703 P.2d 482 (Ariz. 1985). Then, from 1986 through 2017, Hooper filed five petitions for postconviction relief. *See Hooper II*, 985 F.3d at 612. Hooper also filed a federal habeas petition in 1998, and that proceeding remained

5

pending until the Supreme Court denied certiorari earlier this year. *See Hooper v. Shinn*, 142 S. Ct. 1376 (2022); *Hooper II*, 985 F.3d at 613.

### D. *Warrant of execution and request for forensic testing.*

On August 26, 2022, the State filed a motion for warrant of execution in the Arizona Supreme Court. Nearly a month later, on September 22, 2022, Hooper filed a request for postconviction DNA and forensic testing under A.R.S. §§ 13–4240 and –4241 in Maricopa County Superior Court. Dkt. # 1–1, Exhibit A. The motion requested an order for testing of fingerprints "lifted from the crime scene under A.R.S. § 13–4241(A)(2) and DNA testing of the "bloodied kitchen knife" pursuant to A.R.S. § 13–4240(B) and (C). *Id.* On October 12, 2022, the Arizona Supreme Court issued a warrant of execution, with an execution date of November 16, 2022.

The superior court denied Hooper's request for testing. Dkt. # 1–1, Exhibit B. First, the court rejected Hooper's request for fingerprint testing:

> After reviewing the facts and evidence presented at trial, making specific factual findings, and "agree[ing] with the Ninth Circuit that the totality of the evidence [showing Hooper's guilt] in this case 'is overwhelming,'" the superior court found that "no 'reasonable probability exists that [Petitioner] would not have been prosecuted or convicted if exculpatory results had been obtained through the new forensic testing,'"[1] and therefore, denied Petitioner's motion for advanced testing of the fingerprint evidence.

Dkt. # 1–1, Exhibit D, at 1. The court then turned to Hooper's DNA testing request:

> Next, based on the court's analysis that parallels its analysis of Petitioner's request for fingerprint testing pursuant to A.R.S. § 13-4241(A)(2), the superior court found that "evidence of another

---

[1] A.R.S. § 13–4241(B) requires postconviction forensic testing only if "[a] reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through the new forensic testing."

6

person's DNA on the knife—[exculpatory evidence]—would not create. . . 'a reasonable probability that [Petitioner] would not have been prosecuted or convicted. . .'" and therefore, the court held it "cannot grant [Petitioner's] motion for DNA testing under [§ 13-4240(B)]" and denied the motion.[2]

Based on its analysis being "identical to the analysis of Petitioner's request for fingerprint testing pursuant to A.R.S. § 13-4241(A)(2) and the request for DNA testing under A.R.S. § 13-4240(B)," the superior court held it "cannot find that the petitioner's verdict or sentence would have been more favorable."[3] Specifically, the court held that it "cannot find the verdict or the sentence 'would have been more favorable' in light of so much evidence against [Petitioner], coupled with a reasonable explanation about why another person's DNA may have been on the knife."

Further, the court held that it "does not find under these facts that a favorable DNA test, meaning detecting the presence of a co-defendant's DNA or another person's DNA [on the knife], would have resulted in a different verdict or more lenient sentence for [Petitioner]." Finally, the superior court held that "[t]o the extent that [Petitioner] asked the Court to allow postconviction DNA testing pursuant to A.R.S. § 13-4240(C)(1)(b), the record [does] not support a finding that DNA testing '*will* produce exculpatory evidence'" and denied the motion. *See* A.R.S. §13-4240(C)(1)(b) (2022) (emphasis added).

*Id.* at 1–2.

Hooper filed a Petition for Special Action asking the Arizona Supreme Court to reverse the superior court's decision. Dkt. # 1–1, Exhibit C. On November 10, 2022, the Arizona Supreme Court issued a decision order affirming the superior court's finding that Hooper failed to meet the statutory grounds for postconviction

---

[2] A.R.S. § 13–4240(B) requires postconviction DNA testing if there is a reasonable probability "that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through [DNA] testing."

[3] A.R.S. § 13–4240(C)(1) permits, but does not require, a court to order DNA testing if there is a reasonable probability that "[t]he petitioner's verdict or sentence would have been more favorable if the results of [DNA] testing had been available at the trial leading to the judgment of conviction" or that DNA testing "will produce exculpatory evidence."

fingerprint testing pursuant to A.R.S. § 13–4241 and failed to meet the statutory grounds for postconviction DNA testing pursuant to either A.R.S. §§ 13–4240(B) or –4240(C). Dkt. # 1–1, Exhibit D, at 5–6.

The Arizona Supreme Court found that the superior court "applied the proper analysis" under state law and did not abuse its discretion in concluding that "because the trial testimony was 'compelling and consistent, and was corroborated' by circumstantial and other physical evidence, even if the DNA testing resulted in exculpatory evidence (i.e., evidence inculpating other persons), there is not a reasonable probability that Hooper would not have been prosecuted or convicted." *Id.* at 4. Further, in light of the overwhelming evidence against Hooper and a reasonable explanation why another person's DNA may have been on the knife, the superior court did not abuse its discretion in holding that exculpatory DNA results would not have resulted in a more favorable verdict or sentence. *Id.* at 5. Finally, the Arizona Supreme Court concluded that the superior court applied the correct analysis under state law in addressing Hooper's request for fingerprint testing and did not abuse its discretion in finding that, even if "Merrill's or Campagnoni's fingerprints were in the residence," that fact "would not outweigh the overwhelming evidence establishing Hooper's guilt, and therefore did not establish a reasonable probability Hooper would not have been prosecuted or convicted." *Id.* at 5.

The same day that the Arizona Supreme Court affirmed the superior court's decision, Hooper filed a Complaint asserting that the Arizona Supreme Court's decision violated his due process and Eighth Amendment rights and deprived him of meaningful access to the courts. His Complaint requests a declaratory judgment that the state courts' application of A.R.S. §§ 13–4240 and –4241 violated his federal rights and an injunction requiring Defendants Brnovich and Williams to preserve all physical evidence and to provide him with "access to evidence for fingerprint and DNA testing." Dkt. # 1. Hooper also filed the instant motion,

requesting this Court to enter a stay of execution and "either (2) order the state courts to grant the testing of both fingerprints and DNA to occur, or (3) permit full briefing and argument on his Forensic Testing claim." Dkt. # 3, at 8–9.

## II. HOOPER IS NOT ENTITLED TO INJUNCTIVE RELIEF.

"[A] preliminary injunction is an extraordinary remedy never awarded as of right." *Benisek*, 138 S. Ct. at 1943 (quotation marks omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Thus, even if a plaintiff can show a likelihood of success on the merits, "a preliminary injunction does not follow as a matter of course." *Benisek*, 138 S. Ct. at 1943. These principles apply with equal force "even in the context of an impending execution." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012); *see also Hill v. McDonough*, 547 U.S. 573, 583–84 (2006) ("Filing an action that can proceed under § 1983 does not entitle the complainant to an order staying an execution as a matter of course.").

### A. *Hooper is not reasonably likely to succeed on the merits.*

#### 1. Hooper's claims are barred by the *Rooker-Feldman* doctrine.

The *Rooker-Feldman* doctrine bars state-court litigants from using a § 1983 suit to obtain federal court review of state court judgments. *See Skinner v. Switzer*, 562 U.S. 521, 531 (2011). "The doctrine bars a district court from exercising jurisdiction not only over an action explicitly styled as a direct appeal, but also over the 'de facto equivalent' of such an appeal." *Cooper v. Ramos*, 704 F.3d 772, 777 (9th Cir. 2012). "It is a forbidden de facto appeal under *Rooker–Feldman* when the plaintiff in federal district court complains of a legal wrong

9

allegedly committed by the state court, and seeks relief from the judgment of that court." *Id.* at 778 (quotation omitted).

In *Skinner*, the Court allowed a state prisoner's challenge to a denial of DNA testing under a state statute to proceed under § 1983 because the prisoner did "not challenge the adverse [state court] decisions themselves; instead he target[ed] as unconstitutional the Texas statute they authoritatively construed"; that is, the prisoner's claim assailed the state courts' construction of the statute "to completely foreclose any prisoner who could have sought DNA testing prior to trial, but did not, from seeking testing postconviction." *Id.* at 531, 532 (quotation omitted). In *Cooper*, however, the Ninth Circuit held that the prisoner's claim challenging the state court's denial of postconviction DNA testing was barred by *Rooker-Feldman*. 704 F.3d at 779–81. In contrast to *Skinner*, "where the prisoner asserted that the Texas statute was constitutionally adequate to *any* prisoner who failed to seek DNA testing before trial," the prisoner in *Cooper* did not challenge the constitutionally of the statute but instead challenged the state court's conclusion that the facts of the prisoner's case did not meet the statute's requirements. *Id.* at 780–81. Though the prisoner contended that the statute violated "due process by foreclosing access to DNA testing for convicted criminal who allege that they were framed through planted DNA evidence," the court found that nothing in the statute's text or state court's decision contained any such categorical rule. *Id.* at 781.

Hooper's claims are akin to those in *Cooper*. Hooper purports to challenge the Arizona courts' construction of A.R.S. §§ 13–4240 and –4241 as unconstitutionally requiring him to "prove his innocence as a precondition of obtaining DNA and fingerprint testing, when DNA and fingerprint testing are the only means in some cases, like [his] to exonerate the wrongly convicted." Dkt. # 1, at 12–13. But the state courts imposed no such categorical rule. Instead, as detailed above, the Arizona courts concluded that, based on the particular facts of Hooper's case, he failed to meet the statutory requirement of showing a

| 1 | "reasonable probability" that he "would not have been prosecuted or convicted if
| 2 | exculpatory results had been obtained." *See* Dkt. # 1–1, Exhibit D at 1–2, 5–6.
| 3 | Betraying the true nature of his claim, Hooper contends that the state court reached
| 4 | the wrong result under the statute: "[h]aving satisfied the materiality requirements
| 5 | of A.R.S. § 13–4241 and A.R.S. § 13–4240, Plaintiff's motion for DNA and
| 6 | fingerprint testing should have been granted." Dkt. # 1 at 10, ¶ 41. Thus, because
| 7 | Hooper "in fact challenges the particular outcome in his state case, it is immaterial
| 8 | that [he] frames his federal complaint as a constitutional challenge to the state
| 9 | court's decision, rather than as a direct appeal of that decision." *Cooper*, 704 F.3d
| 10 | at 721 (quotation omitted).

Hooper's First and Eighth Amendment claims are likewise barred by *Rooker-Feldman* because they are "inextricably intertwined" with his due process claims. Those claims, too, challenge the outcome of his state case, but simply do so under a different legal theory. *See id.* at 778–79 (claims are "inextricably intertwined" with forbidden de facto appeal where "the relief requested in the federal action would effectively reverse the state court decision or void its ruling") (quotation omitted). Because the *Rooker-Feldman* doctrine bars Hooper's claims, he cannot show a reasonable likelihood of success on the merits.

Even if Hooper's claims were not jurisdictionally barred, he still cannot show a likelihood of success. Hooper argues that he "has been denied access to critical evidence—such as DNA present on the knife used to commit the murder, and the fingerprints lifted from the scene" in violation of his due process rights. Dkt. # 3 at 5. Even assuming that Hooper has a protected liberty interest "in demonstrating his innocence with new evidence under state law," *Dist. Atty's Office for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 68 (2009), Hooper is not reasonably likely to succeed on his due process claim.

"'[W]hen a State chooses to offer help to those seeking relief from convictions,' due process does not 'dictat[e] the exact form such assistance must

assume." *Id.* at 69 (quoting *Pennsylvania v. Finley*, 481 U.S. 551, 559 (1987)). The relevant question under due process is "whether consideration of [Hooper's] claim within the framework of the State's procedures for postconviction relief 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgresses any recognized principle of fundamental fairness in operation.'" *Id.* (quoting *Medina v. California*, 505 U.S. 437, 446 (1992)). Thus, a federal court "may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided." *Id.*

Hooper cannot show that A.R.S. §§ 13–4240 and –4241 are fundamentally inadequate in how they "apply to those who seek access to DNA [or other forensic] evidence." *Id.* Hooper argues that he is likely to succeed because "forensic testing statutes mandate testing, even if the trial evidence was overwhelming, so long as forensic testing holds out just a reasonable probability that new evidence, if exculpatory, would have led to a different outcome." Dkt. # 3 at 4. The Arizona Supreme Court rejected this argument, finding it incorrect as a matter of state law because "[t]he proper analysis requires the court to order the requested DNA testing if a reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through [DNA] testing." Dkt. # 1–1, Exhibit D at 4. The superior court "applied the proper analysis" and reached its conclusion "because the trial testimony was 'compelling and consistent, and was corroborated' by circumstantial and other physical evidence, even if the DNA testing resulted in exculpatory evidence (*i.e.*, evidence inculpating other persons), there is not a reasonable probability that Hooper would not have been prosecuted or convicted."[4] *Id.*

---

[4] This Court should afford significant deference to the state courts' factual findings with regard to Hooper's criminal convictions and presume that they are correct absent clear and convincing evidence to the contrary, which Hooper has not

(continued ...)

Hooper fails to establish how the state courts' conclusion under the particulars of his case "'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgresses any recognized principle of fundamental fairness in operation.'" *Osborne*, 557 U.S. at 69 (quoting *Medina*, 505 U.S. at 446). Because the state courts found that no potential testing results could affect Hooper's judgment of guilt, Hooper cannot establish that the application of A.R.S. §§ 13–4240 and –4241 unconstitutionally impeded his interest "in demonstrating his innocence with new evidence under state law." *Osborne*, 557 U.S. at 68. Indeed, "[w]here there is enough other incriminating evidence and an explanation for the DNA result, science alone cannot prove a prisoner innocent." *Id.* at 62 (citing *House v. Bell*, 547 U.S. 518, 540–48 (2006)).

Nor can Hooper demonstrate a reasonable likelihood of success on the merits of his First Amendment, Eighth Amendment, or due process/actual innocence claims. These claims are premised on Hooper's assertion that the state courts' application of Arizona's forensic testing statutes deprived him of access to evidence that he claims would establish his innocence. *See* Dkt. # 1 at 15–17. But the Arizona courts' findings demonstrate that, based on the totality of the evidence, there are *no* potential results from the testing Hooper sought that could establish his innocence.

Hooper offers no explanation for his claim that the Arizona courts have violated the Petition Clause of the First Amendment by denying his motion for forensic testing. *See* Dkt. # 1, at 15–16. To the extent the Petition Clause applies here, Hooper was able to, and did, petition the courts; the fact that his motion was denied because his case did not warrant relief under the applicable statutes does not mean his First Amendment right was infringed. *See We the People Found., Inc. v.*

---

(... continued) presented. *Cf.* 28 U.S.C. § 2254(d)(2), (e)(1).

*United States*, 485 F.3d 140, 143 (D.C. Cir. 2007) (Petition Clause does not require "a government response to or official consideration of a petition for a redress of grievances").

Moreover, to support an access-to-the-courts claim, an inmate must "demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded." *Lewis v. Casey*, 518 U.S. 343, 349–50 (1996). Hooper has identified no such claim; instead, he complains that he is being denied access to evidence. *See Tellis v. Godinez*, 1993 WL 384575, at *2 (9th Cir. 1993) (mem.) ("Here, Tellis is not really complaining about denial of his *access to the courts* as much as a denial of *access to factual information*."). The First Amendment right of access does not include the right of prisoners to "discover grievances[] and to litigate effectively once in court." *Id.* at 354. The Arizona courts' denial of Hooper's late-hour[5] request for postconviction testing based on his failure to meet the statutory standard does not implicate his First Amendment right of access to the courts.

Next, Hooper provides no authority for his proposition that a state court's denial of a request for postconviction forensic testing violates the Eighth Amendment. Moreover, while Hooper asserts that testing of the evidence might show that he is innocent, the Eighth Amendment applies only to punishment imposed after a conviction is obtained. *See Whitley v. Albers*, 475 U.S. 312, 318 (1986) ("The Cruel and Unusual Punishments Clause was designed to protect those convicted of crimes, and consequently the Clause applies only after the State has

---

[5] The statute under which Hooper sought DNA testing, A.R.S. § 13–4240, was enacted in 2000, meaning Hooper could have made the request over two decades ago. *See* 2000 Ariz. Legis. Serv. Ch. 373 (S.B. 1353) (West). Thus, Hooper bears responsibility for the last-minute nature of this litigation and the circumstances which he contends justify a stay of execution.

The statute under which Hooper sought fingerprint testing, A.R.S. § 13–4241, was only enacted in 2021. *See* 2021 Ariz. Legis. Serv. Ch. 157 (S.B. 1469) (West). Nonetheless, Hooper still could have sought that testing well before he actually did so.

14

complied with the constitutional guarantees traditionally associated with criminal prosecutions." (quotation omitted)). Accordingly, Hooper's Eighth Amendment claim fails on its face.

Finally, Hooper also fails to explain how Claim 4, asserting a due process violation based on the purported denial of access to evidence that could alegedly exonerate him, differs in substance from Claim 1, asserting a violation of procedural due process.[6] Hooper cannot show a reasonable likelihood of success on the merits of any of his claims, and his request for a stay should be denied.

### B. *Hooper will not suffer irreparable harm and the equities are not in his favor.*

Even if a plaintiff can show a reasonable likelihood of success on the merits, "a preliminary injunction does not follow as a matter of course." *Benisek*, 138 S. Ct. at 1943. In denying Hooper's request for DNA and fingerprint testing, the state courts found that in light of the totality of the evidence supporting his convictions, even if the testing were to produce the results that Hooper hopes for (i.e., evidence inculpating another person), it would not create a reasonable probability that (1) Hooper would not have been prosecuted or convicted; (2) Hooper would have received a more favorable verdict or sentence; or (3) the results would exculpate Hooper. Dkt. # 1–1, Exhibit D. In the habeas context, factual findings made by state courts are accorded significant deference and are presumed correct. *See* 28 U.S.C. § 2254(d)(2), (e)(1). As explained above, Hooper's claims are essentially habeas claims because they challenge the Arizona courts' adjudication of issues relating to the judgment of guilt in his case. Accordingly, this Court should afford significant deference to the state courts' factual findings.

---

[6] To the extent Hooper asserts a substantive due process violation, the Supreme Court has "rejected the extension of substantive due process" in the context of a state prisoner's challenges to the availability of DNA testing. *Skinner*, 562 U.S. at 525 (citing *Osborne*, 557 U.S. at 72).

In light of the Arizona courts' findings that there is no reasonable probability that the testing Hooper requests would affect his convictions, Hooper will not suffer irreparable harm from the denial of a stay. As the state courts found, even if the testing produced the results Hooper hopes for, it would not affect the judgment of guilt. Thus, his criminal judgment would remain untouched and the State would remain unhindered in its ability to carry out his execution after completion of testing. As a result, Hooper cannot show "that he is likely to suffer irreparable harm in the absence of injunctive relief . . . ." *Benisek*, 138 S. Ct. at 1944.

For similar reasons, Hooper cannot show that the "balance of equities tips in [his] favor." *Benisek*, 138 S. Ct. at 1944. "[E]quity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill*, 547 U.S. at 584. Because the Arizona courts found that no possible results from the testing Hooper seeks could affect his convictions, a stay at this time would accomplish nothing but unnecessary delay in the State's ability to enforce its criminal judgment against Hooper. As a result, equity does not favor injunctive relief.

### C. *A stay is not in the public interest.*

Finally, Hooper must show that "an injunction is in the public interest." *Benisek*, 138 S. Ct. at 1944. Hooper quotes *Cooey v. Taft*, 430 F. Supp. 2d 702, 708 (S.D. Ohio 2006), for the proposition that "the public interest has never been and could never be served by rushing to judgment at the expense of a condemned inmate's constitutional rights." Dkt. # 3, at 6. There has been no rush to judgment here—Hooper has spent the last four decades mounting unsuccessful challenges to his lawfully imposed convictions and death sentences (though not until after the State sought a warrant of execution did he seek the additional forensic testing he seeks at the eleventh hour). And "[b]oth the State and the victims of crime have an important interest in the timely enforcement of a sentence." *Hill*, 547 U.S. at 584. In particular, Arizona has provided victims a constitutional right "to be free from

intimidation, harassment, or abuse, throughout the criminal justice process" and to "a speedy trial or disposition and prompt and final conclusion of the case after the conviction and sentence." Ariz. Const. art. II, § 2.1(1), (10). Hooper's victims have waited 40 years for him to complete his appeals. And, moreover, the Arizona courts have found that the testing he seeks would not affect his convictions. Granting injunctive relief would do nothing more than further delay Hooper's sentence. An injunction thus is not in the public interest.

### III. CONCLUSION.

Hooper has failed to establish that he is entitled to injunctive relief and has provided no grounds that would justify staying his November 16, 2022 execution. This Court should therefore deny his Motion for Temporary Restraining Order or Preliminary Injunction.

DATED this 13th day of November, 2022.

Respectfully submitted,

Mark Brnovich
Attorney General


s/ Jeffrey L. Sparks
Deputy Solicitor General
Section Chief of Capital Litigation

Ginger Jarvis
Laura P. Chiasson
David E. Ahl
Assistant Attorneys General
Capital Litigation Section

Attorneys for Defendant Mark Brnovich

**CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2022, I electronically transmitted the attached document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Kelly L. Culshaw
Nicole List
Nathan A. Maxwell
Assistant Federal Public Defenders
850 W. Adams St., Suite 201
Phoenix, Arizona 85007
kelly_culshaw@fd.org
nicole_list@fd.org
nathan_maxwell@fd.org
Telephone: (602) 382-2816

Attorneys for Plaintiff


/s/ Maria Palacios